2011 Ark. 20

**David Junior SWEET, Appellant,**

v.

**STATE of Arkansas, Appellee.**

**No. CR 10–676.**

Supreme Court of Arkansas.

Jan. 27, 2011.

Kimberly Boling Bibb, Paragould, for appellant.

Dustin McDaniel, Att'y Gen., by: Brad Newman, Ass't Att'y Gen., for appellee.

JIM GUNTER, Justice.

A jury in Crawford County convicted appellant David Sweet of aggravated robbery and kidnapping, and he was sentenced to two consecutive terms of life imprisonment. Our jurisdiction is pursuant to Rule 1–2(a)(2) of the Arkansas Rules of the Supreme Court.

Appellant asserts six arguments on appeal: (1) that the circuit court erred in denying his proffer of jury instructions on the offenses of robbery and false imprisonment; (2) that the circuit court erred in allowing into evidence a videotape and several photographs; (3) that the circuit court erred in refusing to suppress appellant's custodial statements; (4) that the photo lineup provided to the victim was unduly suggestive and created a substantial possibility of misidentification; (5) that the circuit court abused its discretion in denying appellant's request for a mistrial; and (6) that the circuit court erred in denying appellant's motion for directed verdict because there was insufficient evidence to support the aggravated robbery and kidnapping charges. We affirm.

On April 29, 2009, at approximately 5 p.m., Elizabeth Bitzelberger was the last employee to leave the medical clinic in Mulberry, Arkansas. As she was exiting through the back door of the clinic, a man

came at her with a knife. He forced Bitzelberger back into the clinic and used duct tape to cover her mouth and bind her feet and hands. He then demanded money. The man took six dollars out of Bitzelberger's purse and $102.60 out of the cash drawer in the office of the clinic. He then placed Bitzelberger in one of the examination rooms and ripped off her shirt and bra with the knife. Thereafter, he took the keys to Bitzelberger's truck and went out the back door of the clinic to the parking lot. When Bitzelberger heard the back-door bell indicating that the man had left the building, she freed her feet and ran out the front of the clinic, across the street, and into a neighboring pharmacy. There, she had pharmacy employees call for help.

After law enforcement officers arrived on the scene, Bitzelberger gave a description of her attacker and then identified appellant as her attacker from his picture as a registered sex offender on the Arkansas Crime Information Website. The next day, appellant was apprehended by law enforcement. While he was being transported to jail, appellant confessed to Mulberry Police Chief Joshua Craig. Later, appellant gave a videotaped confession to Crawford County Sheriff's Department Detective Ken Howard.

On February 9, 2010, the State filed an amended information charging appellant with aggravated robbery in violation of Ark.Code Ann. § 5–12–103, a Class Y felony; kidnapping in violation of Ark.Code Ann. § 5–11–102, a Class Y felony; attempted rape in violation of Ark.Code Ann. § 5–3–201, a Class A felony; and enhanced sentencing as a habitual offender. Prior to trial, appellant filed a motion to suppress his custodial statements and a motion in limine to exclude Bitzelberger's photographic identification of appellant, a surveillance videotape from the pharmacy across the street showing Bitzelberger running across the street, and photographs of Bitzelberger taken after the incident.

The circuit court held a hearing on the motions on January 28, 2010, with a follow-up hearing held the morning of trial on February 10, 2010. Evidence was presented that appellant had four prior felonies and had served twenty-one years in prison in Georgia. After hearing testimony and argument from both parties, the circuit court found that the photographic identification of appellant by Bitzelberger on the day of the incident was not unduly suggestive because at the time, appellant was not a suspect in the crime. Therefore, an actual photographic lineup had not taken place. The court did prohibit the State from mentioning that the photographs were accessed from the sex-offender registry. The circuit court also found that the videotape and photographs were admissible. As to the suppression of appellant's custodial statements, the circuit court found that appellant made a knowing and voluntary waiver of his rights.

At trial, Bitzelberger identified appellant as the man who accosted her on April 29, 2009. She testified that as she was leaving the Mulberry Clinic, appellant "came at" her with a knife to her throat. He pushed her back into the clinic; taped her mouth, wrists, and ankles with duct tape; and demanded money. Bitzelberger stated that appellant warned her that he would not kill her if she cooperated. She testified that appellant took six dollars out of her purse and then asked her where the clinic money was kept. After appellant removed the tape from her mouth, Bitzelberger told appellant the money was in the front office. Appellant carried Bitzelberger over his shoulder to the front of the clinic where he took $102.60 out of the clinic's coffers. Bitzelberger stated that appellant wiped down the handles of the drawer with his sleeve. Appellant then

carried Bitzelberger back to one of the clinic's examination rooms. There, he placed her on the examination table and re-taped her wrists behind her back. Bitzelberger pleaded with appellant not to hurt her and she would not tell anyone what he had done. Appellant responded that "that's what they all say." Appellant told Bitzelberger that if she did not shut up, he was going to kill her. At that point, appellant used the knife to cut open Bitzelberger's shirt and cut off her bra. Appellant made a comment about Bitzelberger's youth and that "they don't know what they're missing out on." Bitzelberger testified that appellant touched the inside of her leg when he made the statement. Appellant again taped her mouth shut and asked for the keys to her truck. She nodded to her left jacket pocket. Appellant removed the keys from her pocket and exited the clinic through the back door. Bitzelberger stated that when she heard the service bell above the back door indicating that appellant had left, she rolled her ankles to remove the tape. She tripped, fell into a weight scale, hit a table, knocked over several chairs, and ran out the front of the clinic to the pharmacy across the street where employees immediately called for the police.

Bitzelberger testified that she got a good look at appellant during the incident. She described him to police as 5'8" or 5'9", blue-eyed, with salt and pepper hair, a moustache, and an unshaven face. Bitzelberger testified that Detective Patti Bonewell with the Crawford County Sheriff's Department showed her twenty-five pictures to try to identify her attacker. Bitzelberger did not identify any of the men pictured as the perpetrator. However, Detective Bonewell showed Bitzelberger a second batch of photographs, and she immediately identified appellant as her attacker.

Martha Wilkins testified that she was employed by the Mediquik Pharmacy in Mulberry and was working on April 29, 2009. She stated that she saw a man cross the street and go behind the Mulberry Clinic at approximately closing time. Wilkins identified appellant as the man that she saw that day. Ten or fifteen minutes after Wilkins saw the man, Bitzelberger rushed into the pharmacy. Wilkins testified that Bitzelberger's shirt and bra were cut so that her breasts were exposed, that she had duct tape hanging from her ankle, that her hands were taped behind her back, and that she had tape across her mouth.

Franklin County Sheriff's Officer Brent Scott testified that on April 30, 2009, he was summoned to assist in the apprehension of appellant. Dispatch informed Officer Scott that appellant was on foot running west along Highway 64. Officer Scott apprehended appellant at an apartment complex off the highway after several bystanders indicated the direction the man had ran. Officer Scott testified that there was a short foot chase but that after he drew his firearm and warned appellant to stop, he did so. Officer Scott informed appellant of his *Miranda* rights and handed him off to Mulberry Police Chief Joshua Craig.

Chief Craig testified that he arrived at the pharmacy shortly after 911 dispatch reported the call of a possible kidnapping. Chief Craig stated that he recovered a surveillance recording from the pharmacy of the outside perimeter. He said that the next day, he took custody of appellant from Officer Scott and transported appellant to the Crawford County jail. Chief Craig admitted that he did not Mirandize appellant but said that he overheard Officer Scott recite the rights to appellant. On the way to the jail, almost immediately after being placed in the patrol car, appel-

lant began talking and confessed to the officer that he went to the clinic with a knife and duct tape because he needed money. Chief Craig testified that he told appellant that it was best he wait and talk to the investigator at the jail. Appellant, however, kept talking. Appellant told Chief Craig that when the woman opened the back door, appellant pushed his way into the clinic, taped the woman's hands, feet, and mouth, and stole money. Appellant said that he cut her shirt and bra off but that he never intended to hurt her. Appellant stated that he took her keys but realized it was a manual transmission, which he could not drive. When appellant saw the woman run across the street, he fled. Chief Craig testified that toward the end of his confession, appellant began to cry and ask for help.

Detective Patti Bonewell testified that she responded on April 29 to lead the investigation. She stated that when she reached the scene she met with the victim, who still had her hands tied behind her back and was distraught. Detective Bonewell took several pictures of the crime scene and the victim that were admitted into evidence. Detective Bonewell testified that the video surveillance tape provided by the pharmacy, which was played for the jury, showed a man cross the street and go behind the clinic. Several minutes later, the video shows the victim run into the pharmacy with tape on her mouth and her breasts exposed. Detective Bonewell stated that Bitzelberger gave a physical description of her attacker and that, once he was arrested, her description closely resembled appellant. Detective Bonewell explained that she showed Bitzelberger thirty to forty photographs on the day of the incident to try to identify her attacker. Detective Bonewell testified that when Bitzelberger saw the photograph of appellant, she became agitated and physically upset. Detective Bonewell testified that appel-

lant's wallet contained $108 and some change when he was taken into custody.

Detective Ken Howard of the Crawford County Sheriff's Department testified that he interviewed appellant in connection with the case on April 30, 2009. He began the interview by reading appellant his *Miranda* rights and having him sign a waiver of those rights. Appellant circled "yes" and initialed each of the five questions on the form. Moreover, appellant signed the waiver form. Detective Howard stated that he video recorded appellant's interview. A transcript of the interview was admitted into evidence. In the interview, appellant confessed that he went to the Mulberry Clinic to steal money, accosted the victim with a knife at the back door, tied her up, and fled the scene once he realized she had gotten away. Detective Howard testified that appellant did not give him all the facts initially, but rather that he confessed in "bits and pieces."

After the State rested, appellant moved for directed verdict and stated the following:

> As to the aggravated robbery, the State has not presented enough evidence to show that [appellant] could have the culpable mental state, purposefully, based on his mental retardation. There is no evidence of physical force. There are no injuries to the victim to corroborate any type of physical force. There's been conflicting testimony as to what type of knife it was, and there's no knife in evidence.
>
> As to the kidnapping charge there's no evidence that the victim failed to consent or she did not consent in any way. I don't think 15 minutes would qualify as substantially interfering with her liberty.
>
> As to the intent again, based upon his mental retardation, he could not

form a culpable mental state of purposefully.

After making his motion for directed verdict, appellant renewed several motions, including his objection to the pretrial photographic identification, his objection to the State's introduction of photographs and the surveillance video, and the suppression of appellant's custodial statements. The circuit court denied all defense motions.

The defense called Dr. Paul Deyoub to testify regarding his mental examination of appellant. Dr. Deyoub stated that he interviewed appellant on May 21, 2009, and administered several tests to him. Based on the outcome of that testing, Dr. Deyoub scored appellant's intelligence quotient at fifty-two and diagnosed him with mild mental retardation. However, Dr. Deyoub testified that he also diagnosed appellant with malingering, or not giving his best effort on the tests and attempting to control their outcome. Based on appellant's malingering, Dr. Deyoub stated that his intelligence quotient was likely between sixty-five and seventy, which would still qualify as mildly mentally retarded. Although Dr. Deyoub stated that appellant's mild mental retardation was a mental defect under the law, Dr. Deyoub also determined that appellant could appreciate the criminality of his conduct, had the capacity to form the culpable mental state, and could conform his conduct to the requirements of the law.

After the defense rested, appellant renewed his motion for directed verdict arguing almost verbatim the arguments he made in his initial motion for directed verdict. Those motions were denied by the circuit court. The case was submitted to a jury, which found appellant guilty of aggravated robbery and kidnapping,[1] sen-

tenced him to two terms of life imprisonment, and recommended those sentences run consecutive. The circuit court entered a judgment and commitment order on February 19, 2010, sentencing appellant to two consecutive life sentences. Appellant filed a timely notice of appeal on February 26, 2010.

## I. *Sufficiency of the Evidence*

Although appellant presents his challenge to the circuit court's denial of his motion for directed verdict as his last point on appeal, we must address such a challenge first for purposes of double jeopardy. *See Woolbright v. State*, 357 Ark. 63, 160 S.W.3d 315 (2004). This court treats a motion for directed verdict as a challenge to the sufficiency of the evidence. *Tubbs v. State*, 370 Ark. 47, 257 S.W.3d 47 (2007). In reviewing a challenge to the sufficiency of the evidence, this court determines whether the verdict is supported by substantial evidence, direct or circumstantial. *Id.* Substantial evidence is evidence forceful enough to compel a conclusion one way or the other beyond suspicion or conjecture. *Id.* This court views the evidence in the light most favorable to the verdict, and only evidence supporting the verdict will be considered. *Id.* The credibility of witnesses is an issue for the jury and not the court. *Morgan v. State*, 2009 Ark. 257, 308 S.W.3d 147. The trier of fact is free to believe all or part of any witness's testimony and may resolve questions of conflicting testimony and inconsistent evidence. *Id.*

Appellant's first sufficiency argument is that the State failed to establish the necessary elements of aggravated robbery because appellant could not have formed the requisite culpable mental state (purposefully) due to his mental retardation. Appellant also contends that no

---

1. The jury acquitted appellant of the attempted rape charge.

weapon was recovered, that there was no proof that the knife was a deadly weapon, and that there was no proof that appellant intended to inflict or attempted to inflict death or serious physical injury upon the victim.

Arkansas Code Annotated section 5–12–103 (Repl.2006), states that a person commits aggravated robbery if he or she commits a robbery as defined in Ark.Code Ann. § 5–12–102 and:

(1) Is armed with a deadly weapon;

(2) Represents by word or conduct that he or she is armed with a deadly weapon; or

(3) Inflicts or attempts to inflict death or serious physical injury upon another person.

Arkansas Code Annotated section 5–12–102(a) (Repl.2006), states that a person commits the offense of robbery "if, with the purpose of committing a felony or misdemeanor theft . . ., the person employs or threatens to immediately employ physical force upon another person." A "deadly weapon" is defined as a firearm or anything manifestly designed, made, or adapted for the purpose of inflicting death or serious physical injury or anything that in the manner of its use or intended use is capable of causing death or serious physical injury. Ark.Code Ann. § 5–1–102(4) (Supp.2009). Knives have been found to be a deadly weapon in previous cases. *See, e.g., Skiver v. State,* 336 Ark. 86, 983 S.W.2d 931 (1999); *Wilson v. State,* 282 Ark. 551, 669 S.W.2d 889 (1984).

The evidence in this case is sufficient to support the jury's finding that appellant committed aggravated robbery. Dr. Deyoub testified that although appellant suffered from mild mental retardation, he was able to appreciate the criminality of his conduct and conform his behavior to the law. There is no indication in Dr. Deyoub's testimony that he believed appellant could not form the culpable mental state. In fact, just the opposite. Dr. Deyoub specifically noted that appellant had the capacity to form the culpable mental state. Furthermore, Bitzelberger's testimony was that appellant assaulted her with a knife. It was reasonable for the jury to consider a knife a deadly weapon, and that conclusion is supported by our prior case law. Additionally, the statute does not require that appellant inflict or attempt to inflict death or serious physical harm to the victim. That element is preceded by the conjunction "or." The facts were that appellant was armed with a knife, used it to threaten to kill Bitzelberger, and then stole money from her and the clinic. That evidence is sufficient to support the aggravated-robbery conviction.

■ Appellant's second sufficiency argument is that the State failed to prove the necessary elements of the offense of Class Y kidnapping. A person commits kidnapping if, without consent, he restrains another person so as to interfere substantially with the other person's liberty with the purpose of facilitating the commission of any felony; facilitating flight after the commission of any felony; inflicting physical injury upon the other person; or terrorizing the other person. Ark.Code Ann. § 5–11–102 (Repl.2006). Kidnapping is a Class Y felony except that the statute makes clear that the offense is to be considered a Class B felony if the defendant can show by a preponderance of the evidence that he or she or an accomplice voluntarily released the person restrained alive and in a safe place prior to trial. Ark.Code Ann. § 5–11–102(b)(2) (Repl. 2002).

■ Appellant maintains that because the victim in this case was released by appellant in a safe place, the State failed to prove the necessary elements of

the Class Y felony of kidnapping but instead proved appellant guilty of Class B felony kidnapping. As a threshold matter, we must determine whether this argument is preserved for our review. To preserve a challenge to the sufficiency of the evidence for appeal, a clear and specific motion for a directed verdict must be made to the trial court. *Pinell v. State*, 364 Ark. 353, 219 S.W.3d 168 (2005). Arkansas Rule of Criminal Procedure 33.1 establishes the procedure for making the motion and reads in pertinent part:

> (a) In a jury trial, if a motion for directed verdict is to be made, it shall be made at the close of the evidence offered by the prosecution and at the close of all of the evidence. A motion for directed verdict shall state the specific grounds therefor.
>
> . . . .
>
> (c) The failure of a defendant to challenge the sufficiency of the evidence at the times and in the manner required in subsections (a) and (b) above will constitute a waiver of any question pertaining to the sufficiency of the evidence to support the verdict or judgment. A motion for directed verdict or for dismissal based on insufficiency of the evidence must specify the respect in which the evidence is deficient. A motion merely stating that the evidence is insufficient does not preserve for appeal issues relating to a specific deficiency such as insufficient proof on the elements of the offense. A renewal at the close of all of the evidence of a previous motion for directed verdict or for dismissal preserves the issue of insufficient evidence for appeal. If for any reason a motion or a renewed motion at the close of all of the evidence for directed verdict or for dismissal is not ruled upon, it is deemed denied for purposes of obtaining appellate review on the question of the sufficiency of the evidence.

We have said that the reasoning behind this rule is "that when specific grounds are stated and the absent proof is pinpointed, the circuit court can either grant the motion, or, if justice requires, allow the State to reopen its case and supply the missing proof." *Pinell*, 364 Ark. at ⌊₁₃357, 219 S.W.3d at 171. An additional reason for the requirements under Rule 33.1 is that this court may not decide an issue raised for the first time on appeal. *Elkins v. State*, 374 Ark. 399, 288 S.W.3d 570 (2008).

In his motion for directed verdict following the State's case-in-chief, appellant argued only that the State failed to present sufficient evidence that the victim's liberty was substantially interfered with or that she had not consented to the restraint. Appellant's renewal of that motion was substantially the same. Appellant never argued below that the evidence presented by the State proved Class B felony kidnapping but not Class Y. Pursuant to our case law, we decline to address that specific argument because it was not preserved for our review. *See Pinell, supra.*[2]

---

**2.** Appellant also includes a sentence in this section of his argument noting that the victim was detained for only a short period of time and was unharmed by appellant. Even characterizing that single sentence as appellant's attempt to re-argue that the victim's liberty was not substantially interfered with so as to satisfy the elements of kidnapping, an argument that appellant did preserve at trial by his motions for directed verdict, we would affirm on that point. The State clearly established that appellant taped Bitzelberger's hands and feet with duct tape, restrained her at knife-point, and did not release her but left her alone and bound so that he could go out to her vehicle. Thereafter, she escaped. While she was only restrained for ten to fifteen minutes, that time period was dictated by the fact that she was able to get away, not because appellant released her. The evidence that the State presented was sufficient for a

## II. *Lesser–Included Offenses*

Appellant argues that the circuit court erred in denying his proffered jury instruction on the lesser-included offense of robbery and first- and second-degree false imprisonment. Specifically, appellant contends that the court should have instructed the jury on robbery because appellant told the police that he never intended to hurt the victim and because there was no proof that he actually used a knife in the commission of the crime. Furthermore, appellant maintains that the jury should have been instructed on false imprisonment in the first and second degree because the victim was able to free herself and escape and the time she was restrained was only approximately fifteen minutes.

An instruction on a lesser-included offense is appropriate when it is supported by even the slightest evidence. *Grillot v. State*, 353 Ark. 294, 107 S.W.3d 136 (2003). Once an offense is determined to be a lesser-included offense, the circuit court is obligated to instruct the jury on that offense only if there is a rational basis for a verdict acquitting the defendant of the offense charged and convicting him of the lesser-included offense. *Williams v. State*, 363 Ark. 395, 214 S.W.3d 829 (2005). A trial court's ruling on whether to submit a jury instruction will not be reversed absent an abuse of discretion. *Grillot, supra.*

The elements of aggravated robbery and robbery are fully explained above in the section on sufficiency. Ordinary robbery is generally a lesser-included offense of aggravated robbery, and more often than not a robbery instruction is required when the charge is aggravated robbery. *Brown v. State*, 347 Ark. 44, 60 S.W.3d 422 (2001). However, when the

evidence is so conclusive as to show that only aggravated robbery was committed, the judge need not instruct the jury on mere robbery. *Id.* In *Isom v. State*, 356 Ark. 156, 148 S.W.3d 257 (2004), we concluded that there was no rational basis for the circuit judge to instruct the jury on ordinary robbery. There, the defendant had pushed into the victim's trailer home, demanded money, and pulled out a pair of broken scissors to enforce his demand. We held that those facts supported the circuit judge's decision not to instruct on simple robbery.

Here, Bitzelberger testified that appellant held a knife to her throat, threatened to kill her if she did not cooperate, and forced her into the deserted clinic. Thereafter, appellant bound her with duct tape and cut her shirt and bra with the knife, fully exposing her breasts. Appellant admitted to police that he used a knife to steal money from Bitzelberger and the clinic. He also admitted that he used the knife to cut the victim's shirt and bra. Certainly, the knife was therefore sharp enough to be capable of cutting through fabric and a bra strap. Based on these facts, we cannot say that the circuit court abused its discretion in refusing to instruct the jury on ordinary robbery because the evidence provided by the State clearly establishes appellant was guilty of aggravated robbery.

As to whether the circuit court erred in declining to instruct the jury on false imprisonment, we have held that neither first-degree nor second-degree false imprisonment is a lesser-included offense to kidnapping. *Davis v. State*, 365 Ark. 634, 232 S.W.3d 476 (2006). In *Davis*, we explained that first- and second-degree false imprisonment include elements not required to prove kidnapping. Therefore,

jury to find that appellant substantially interfered with the victim's liberty.

it was not error for the circuit judge to refuse to instruct the jury on false imprisonment as it is not considered a lesser-included offense to kidnapping.

### III. Admissibility of Videotape and Photographs

Appellant's next argument is that the circuit court erred in allowing the State to introduce into evidence (1) a surveillance videotape that was provided to police by the pharmacy that showed the victim run across the street and into the pharmacy and (2) and photographs identified as State's Exhibits 22 through 30 that depicted the scene of the crime. Appellant asserts that the videotape was cumulative and inflammatory, especially in light of the fact that witnesses had testified to the events on the day of the incident. Similarly, appellant argues that the photographs the State introduced, which depicted the duct tape around Bitzelberger's ankles and wrists, the minor injuries she sustained as a result of her escape, and her partially nude torso, were cumulative and introduced only to elicit an emotional response from the jury.

As with other matters pertaining to the admissibility of evidence, the admission of photographs is a matter left to the sound discretion of the trial court, and we will not reverse absent an abuse of that discretion. *Springs v. State*, 368 Ark. 256, 244 S.W.3d 683 (2006). When photographs are helpful to explain testimony, they are ordinarily admissible. *Id.* Moreover, the mere fact that a photograph is inflammatory or is cumulative is not, standing alone, sufficient reason to exclude it. *Id.* Even the most gruesome photographs may be admissible if they assist the trier of fact in any of the following ways: by shedding light on some issue, by proving a necessary element of the case, by enabling a witness to testify more effectively, by corroborating testimony, or by enabling jurors to better understand the testimony. *Id.* The same requirements for the admission of photographs apply to the admission of video evidence. *Williams v. State*, 374 Ark. 282, 287 S.W.3d 559 (2008).

We affirm the circuit court's decision on the admissibility of this evidence. Both the videotape and photographs were relevant to corroborate the testimony of witnesses. The videotape shows Bitzelberger run across the street, but it has no sound element. The photographs are ten of thirty photographs the State intended to admit into evidence. They illustrate Bitzelberger's condition shortly after the incident occurred, showing her injuries and her state of undress. Nothing in the videotape nor the photographs is extraordinarily sensational or gruesome. Both the videotape and the photographs simply show the victim as appellant left her. Based on our precedent, we are satisfied that the circuit court did not abuse its discretion in allowing the videotape and the ten photographs into evidence where those items where informative of what happened on the day in question and corroborated the testimony of the State's witnesses.

### IV. Custodial Statements

Appellant argues that the circuit court erred in not suppressing appellant's custodial statements because they were made without a knowing, voluntary, and intelligent waiver of his rights. First, appellant contends that appellant's statement to Chief Craig while being driven to the jail should be suppressed because "it was improbable that [Chief] Craig could ensure [a]ppellant made a knowing, intelligent and voluntary waiver of his rights when said rights were given allegedly by another person in such a noisy, chaotic environment where [Chief] Craig admitted

he didn't hear the exact words being said." Second, appellant asserts that appellant's videotaped statement made at the jail should have been suppressed. However, appellant fails to develop this second argument in his brief on appeal. He makes vague statements that Detective Ken Howard knew that appellant was "not the brightest individual," and that Dr. Deyoub had diagnosed him with mild mental retardation, but appellant never cites to any authority or provides any persuasive argument that the formal waiver appellant signed at the jail was involuntarily or not knowingly made. We do not address arguments that are not supported by authority or convincing argument. *Hathcock v. State*, 357 Ark. 563, 182 S.W.3d 152 (2004). Consequently, we address the merits of appellant's waiver argument as to his patrol-car confession, which appellant articulated with proper argument and citation to authority in his brief on appeal.[3]

A statement made while in custody is presumptively involuntary, and the burden is on the State to prove by a preponderance of the evidence that a custodial statement was given voluntarily. *Bell v. State*, 371 Ark. 375, 266 S.W.3d 696 (2007). In *Grillot v. State*, 353 Ark. 294, 107 S.W.3d 136 (2003), we clarified the appropriate standard of review for cases involving a trial court's ruling on the voluntariness of a confession—we make an independent determination based upon the totality of the circumstances. We review the trial court's findings of fact for clear error, and the ultimate question of whether the confession was voluntary is subject to an independent, or de novo, determination by this court. *Clark v. State*, 374 Ark. 292, 287 S.W.3d 567 (2008).

In order to determine whether a waiver of *Miranda* rights is voluntary, knowing, and intelligent, this court looks to see if the statement was the product of free and deliberate choice rather than intimidation, coercion, or deception. *Flanagan v. State*, 368 Ark. 143, 243 S.W.3d 866 (2006). To make this determination, we review the totality of the circumstances surrounding the waiver including the age, education, and intelligence of the accused; the lack of advice as to his constitutional rights; the length of the detention; the repeated and prolonged nature of the questioning; the use of mental or physical punishment; and statements made by the interrogating officers and the vulnerability of the defendant. *Id.* Although mental capacity is a factor to be considered, standing alone it does not support suppression. *See Rankin v. State*, 338 Ark. 723, 1 S.W.3d 14 (1999). Additionally, the fact that the defendant is not a stranger to the criminal-justice system is a factor to be considered in determining whether a custodial statement was voluntarily made. *Id.* Again, we will reverse a circuit court's ruling on this issue only if it is clearly against the preponderance of the evidence. *Flanagan, supra.*

In *Fairchild v. State*, 349 Ark. 147, 76 S.W.3d 884 (2002), we held that a suspect's spontaneous statement while in police custody is admissible and that it is irrelevant whether the statement was made before or after *Miranda* warnings because a spontaneous statement is not compelled or the result of coercion under the Fifth Amendment's privilege against self-incrimination. *See also Miranda v. Arizona*, 384 U.S. 436, 478, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) ("Volunteered statements of any kind are not barred by the Fifth Amend-

---

3. Mindful of the requirements of Rule 4–3(i) of the Arkansas Rules of the Supreme Court, we have reviewed appellant's second confession made at the jail, and we are convinced the waiver of rights signed by appellant was knowingly and voluntarily made.

ment and their admissibility is not affected by our holding today.").

Here, appellant appears to be arguing that the spontaneous statements he made in the patrol car to Chief Craig while being transported to the jail should have been suppressed because although Chief Craig testified that he heard Officer Scott give appellant his *Miranda* rights, it was noisy and chaotic and Chief Craig admitted he did not hear every single word Officer Scott said. Officer Scott testified that he read appellant his *Miranda* rights when he arrested him. Chief Craig testified that he took immediate custody of appellant from Officer Scott after overhearing him give appellant his rights. Chief Craig testified that appellant spontaneously confessed in the back of the patrol car, even after Chief Craig warned him it was best to wait until he got to the jail. There is nothing in the record to indicate that appellant did not understand his rights or that he did not hear the recitation of those rights by Officer Scott. Although appellant was diagnosed as mildly mentally retarded, there is not even a suggestion of coercion in the record. Mild mental retardation standing alone is not sufficient to require suppression. Furthermore, appellant's confession in the patrol car was spontaneously given. Based on our holding in *Fairchild*, spontaneous statements are always admissible regardless of whether *Miranda* rights have been given. Based on the totality of the circumstances, we cannot say that the circuit court erred in this instance.

## V. *Photographic Identification*

As a threshold matter, the State asserts that appellant failed to preserve his argument with regard to the pretrial photographic identification because he did not object to the in-court identification at trial. This court has held that a challenge to an out-of-court photographic identification is not preserved for review where, despite challenging the photo identification prior to trial, the appellant failed to object to the victim's in-court identification. *Ellis v. State*, 364 Ark. 538, 222 S.W.3d 192 (2006); *see also Lewis v. State*, 354 Ark. 359, 363, 123 S.W.3d 891, 893 (2003) ("To preserve a challenge to a pretrial photographic identification, we require a contemporaneous objection to in-court identification at trial."); *Goins v. State*, 318 Ark. 689, 699–700, 890 S.W.2d 602, 607 (1995) ("Neither Goins nor Davis objected at trial on the basis that Ms. Price's in-court identification of them was unreliable or tainted by the pretrial photographic lineup."). In *Ellis*, as here, the defendant made a motion to suppress the photo identification which was denied during a pretrial hearing. However, because Ellis did not object to the in-court identification at trial, this court found that the argument was procedurally barred. Similarly, in this case, appellant did not object when Bitzelberger identified him in court as the perpetrator. Although appellant renewed his objection several times during the trial to the pretrial photographic identification, he did not contemporaneously challenge the victim's in-court identification as tainted by what he alleged was a suggestive pretrial lineup. Consequently, appellant's argument on this point is procedurally barred.

## VI. *Mistrial*

For his final point on appeal, appellant argues that the circuit court abused its discretion in failing to grant a mistrial after Dr. Deyoub made a statement during his testimony referring to appellant's prior criminal history. After being questioned as to whether appellant could understand the charges against him, Dr. Deyoub made the comment that "there were two separate cases that I questioned him about. . . .

He had an explanation for the failure to register that he gave." Dr. Deyoub's comment referred to charges appellant faced for failing to register as a sex offender. Appellant's counsel did not make an immediate motion for mistrial. Rather, appellant's counsel objected on the basis that the response was "outside the scope of my question." The judge directed the doctor to answer only the question that was being asked. Appellant's counsel completed his redirect examination, and the State asked several questions on cross-examination. After the doctor had been excused, appellant's attorney moved for mistrial on the basis that Dr. Deyoub's mention of appellant's "failure to register" would prejudice the jury. The circuit court denied the motion and found that the doctor's comment did not even make clear what the failure-to-register charge involved.

A mistrial is a drastic remedy and should be declared only when there has been an error so prejudicial that justice cannot be served by continuing the trial and when it cannot be cured by an instruction to the jury. *Tryon v. State*, 371 Ark. 25, 263 S.W.3d 475 (2007). An admonition to the jury usually cures a prejudicial statement unless it is so patently inflammatory that justice could not be served by continuing the trial. *Zachary v. State*, 358 Ark. 174, 188 S.W.3d 917 (2004). The circuit court has broad discretion in granting or denying a motion for a mistrial, and this court will not reverse the circuit court's decision absent an abuse of discretion. *Williams v. State*, 371 Ark. 550, 268 S.W.3d 868 (2007).

This court has consistently held that a motion for mistrial must be made at the first opportunity. *See, e.g., Ellis v. State*, 366 Ark. 46, 233 S.W.3d 606 (2006); *King v. State*, 361 Ark. 402, 206 S.W.3d 883 (2005); *Rodgers v. State*, 360 Ark. 24, 199 S.W.3d 625 (2004); *Ferguson v. State*, 343 Ark. 159, 33 S.W.3d 115 (2000). The reason for this is that a circuit court should be given an opportunity to correct any perceived error before prejudice occurs. *Ellis, supra.* In *Ellis*, defense counsel did not make his motion for mistrial until the prosecutor had already asked three additional unrelated questions. *Id.* Furthermore, defense counsel contemporaneously objected to the question, arguing that what the witness had told the prosecutor outside the courtroom was not relevant, and that objection was sustained. *Id.* This court has previously held that it was proper to deny a motion for mistrial when the request was not made at the first opportunity, even though the motion had been preceded by defense objections sustained by the trial court. *See, e.g., Smith v. State*, 330 Ark. 50, 953 S.W.2d 870 (1997); *Dixon v. State*, 310 Ark. 460, 839 S.W.2d 173 (1992); *Dumond v. State*, 290 Ark. 595, 721 S.W.2d 663 (1986).

Appellant claims that Dr. Deyoub's statement was so egregious that the circuit court should have granted a mistrial. Appellant claims that the jury at that point saw him as a sex offender. However, appellant's mistrial motion was not timely. Here, defense counsel contemporaneously objected to Dr. Deyoub's comment, and the judge instructed the witness to answer the question asked, but defense counsel failed to move contemporaneously for a mistrial. Accordingly, pursuant to our precedent, it was not error for the circuit court to deny the motion as it was untimely made.

## VII. *Rule 4–3(i) Review*

In addition to the arguments raised by appellant, we have reviewed the record in this case for reversible error pursuant to

Arkansas Supreme Court Rule 4–3(i) (2010), and have |$_{24}$found none.

Affirmed.