Cite as 2025 Ark. App. 316

# ARKANSAS COURT OF APPEALS
## DIVISION II
### No. CR-24-554

| | | |
|---|---|---|
| ROBERT HERRINGTON | | Opinion Delivered May 21, 2025 |
| | APPELLANT | |
| | | APPEAL FROM THE MONTGOMERY COUNTY CIRCUIT COURT [NO. 49CR-22-8] |
| V. | | |
| STATE OF ARKANSAS | | HONORABLE ANDY RINER, JUDGE |
| | APPELLEE | |
| | | AFFIRMED IN PART; REVERSED AND REMANDED IN PART |

**ROBERT J. GLADWIN, Judge**

Robert Herrington appeals his convictions by a Montgomery County jury on charges of (1) Class Y felony rape—sexual intercourse or deviate sexual activity with another person who is less than fourteen years old; (2) Class Y felony rape—sexual intercourse or deviate sexual activity with a minor by the minor's guardian; (3) Class A misdemeanor third-degree domestic battering; (4) Class Y felony introduction of a controlled substance into the body of another; and (5) Class D felony possession of less than two grams of methamphetamine, for which he was sentenced to an aggregate term of 120 years' imprisonment. He argues that (1) there was insufficient evidence of the victim's age as required for the first count of rape; (2) there was insufficient evidence to support the introduction-of-a-controlled-substance conviction; (3) his possession-of-methamphetamine conviction is barred by the Joshua Ashley-Pauley Act—codified at Arkansas Code Annotated sections 20-13-1701 to -1705 (Repl.

2023); (4) the imposition of a copy-expense fee is illegal; and (5) the State inappropriately used voir dire to educate the jury panel on the facts of the case. We affirm in part and reverse and remand in part.

## I. *Facts and Procedural History*

On August 20, 2021, then seventeen-year-old Minor Child ("MC") presented to a hospital emergency room after overdosing on methamphetamine. At that time, she weighed a mere seventy-five pounds. She reported that Herrington, her biological father, had repeatedly raped her and injected her with methamphetamine before forcing her to have sex, slapped her, and tied her to a chair in a closet. As a result of this report and subsequent investigation, Herrington was arrested.

On February 28, 2022, Herrington was initially charged with two counts of rape. The State amended the information three times, with the third amended information filed on January 26, 2024, charging him with (1) Class Y felony rape—sexual intercourse or deviate sexual activity with another person who is less than fourteen years old; (2) Class Y felony rape—sexual intercourse or deviate sexual activity with a minor by the minor's guardian; (3) Class A misdemeanor third-degree domestic battering; (4) Class Y felony introduction of a controlled substance into the body of another; and (5) Class D felony possession of less than two grams of methamphetamine.

Herrington's jury trial was held on January 29, 2024. His counsel made three objections during the State's voir dire examination. The first occurred when the State was outlining Herrington's criminal charges to the jury panel:

Okay. Give you a brief outline of the facts so you'll kind of have context for this voir dire portion of the trial. As the judge read the charges, two counts of rape, introduction of controlled substance, possession of methamphetamine and domestic battery. The defendant here is accused of having sexual intercourse with his daughter before she was fourteen and after she was fourteen and so that's why there's two counts of rape. He's also accused of possessing methamphetamine.

Herrington's counsel objected: "We don't need to give them facts and then quiz them on specific conclusions or how they'll feel about or how they would react to. So, I object to this line of voir dire." The State asserted that it would not go into specifics but needed to provide some background for its questions so it could "inquire about their opinions on these kinds of cases and find out if they have any biases or experiences related to it." The circuit court stated that it would allow "some latitude" but instructed the State not to go "deep into the facts" and to stick to seeking "their general opinions about broad concepts[.]"

Herrington's next voir dire objection occurred in response to a series of questions from the State on witnessing abuse. The State first asked if anyone had "ever . . . witnessed somebody being abused?" After receiving no response, the State asked the panel where child rapes took place, "[i]n public or in private?" When the prospective jurors responded "[i]n private[,]" the State asked, "So probably there's going to be very few eyewitnesses that see some child getting abused, right?" Herrington again objected and argued that the State was "climbing into fact qualifying territory[.]" The circuit court again noted that it would allow "a little latitude" but also instructed the State not to go "deep into the facts" and to "just . . . move on." After this instruction, the State asked the prospective jurors why they thought

child sexual abuse happened in private, and the prospective jurors responded that the conduct was illegal, and defendants were afraid of getting caught.

Herrington's final voir dire objection occurred after the State began discussing the elements of each criminal charge. Counsel argued that "[v]oir[] [d]ire is about asking questions to figure out what the jury is going to do if they're the right people to sit. Not give a lesson . . . on every single element of the crime." The circuit court agreed and ordered the State to move on.

MC was the State's first witness. She testified that she lived in Montgomery County with her father, Herrington, when she was between the ages of thirteen and seventeen. The State inquired about the abuse she allegedly suffered during that time:

> STATE: I want to take you back to when you were thirteen years old. You said you lived with your dad here in Montgomery County. Now, do you know what we're here today about?
>
> MC: Over the rape trial?
>
> . . . .
>
> STATE: And who was raped?
>
> MC: Me.
>
> STATE: Okay, and who raped you?
>
> MC: My biological father, Robert Herrington.

MC identified Herrington in the courtroom and described the first time she was raped by her him. She noted that it started with her being molested. MC detailed pretending to sleep in a chair when her father started touching her "vaginal area, the clit, the inside of

4

it with his fingers." She explained that he stopped when his wife walked into the room, but when she walked away, Herrington told MC to follow him outside. They smoked marijuana, which made MC sleepy. Herrington had MC bend over. He moved her shorts aside, pulled out his penis, and put the head of it into MC's vagina.

MC testified that Herrington raped her again two weeks later. She noted that "[i]t progressed just a little bit more. He went a little bit deeper that time and a little bit harder." She said that she could not remember how many times she was raped after that because it happened a lot. She noted that by the time she was seventeen years old the rapes became "more frequent, it went from every three days to almost daily." She further said that Herrington would hit her when he raped her.

MC stated that she missed a lot of school during that time. She testified that, at one point, she went to school only four days during a two-week period. She said she skipped school because there was a rumor that "he was doing things to me." And when she returned from school, Herrington accused her of telling people about the rapes and hit her.

MC also testified that the rapes also included drug use. It started out with "hydro and marijuana" and progressed to methamphetamine. MC stated that Herrington had her use methamphetamine because he believed it "made [her] act more like [her] mom." She explained that "he still had this thing from my mom because she had left him [and] never wanted to go back. He thought he was in love with her."

MC testified that during the final two weeks that she lived with Herrington, she was confined to the house and was not allowed to go outside where the neighbors could see her.

She noted that at the very end of her time with him, Herrington made her stay in a closet, noting that if she had been caught in the living room, she would have been in trouble.

MC testified that on August 20, 2021, she was raped by Herrington for the last time. She said that on that day, Herrington injected her with methamphetamine. She tried to resist, pulling her arm away, but Herrington lay on top of her and held her down. By this time, MC, who is five feet two inches tall, weighed just seventy-five pounds. She noted that the methamphetamine made her feel drowsy and "muggy." MC described in detail how Herrington hit her and ordered her to stand up. He then pulled her pants down and raped her. Afterward, he ordered MC to stay in the closet and went to check around the house. He returned a short while later and started to choke MC. This woke MC's sisters up, and MC was allowed to go into the living room. But MC believed she was overdosing on methamphetamine, and Herrington took her to the hospital. She described how he left immediately after dropping her off at the emergency room.

MC stated that she arrived at the hospital with cuts and bruises on her face where Herrington had hit her and bruises on her neck where he had choked her. When hospital staff began asking MC what had happened, she started to answer but explained that she was "really paranoid" and "didn't want anybody coming in . . . while [she was] trying to talk[.]" As a result, the staff locked the main door and started MC on fluids. She described feeling really dizzy and falling asleep. When MC woke up, she divulged the abuse that Herrington had been inflicting on her. MC asserted that she never lived with her father again after that day.

On cross-examination, Herrington's counsel asked MC about her delay in reporting the abuse. She said she tried to talk to her then-stepmother Bonda Herrington, but Bonda would go "directly back to him. And then after she'd tell him, things would only get worse on my side." Defense counsel asked, "So for five years your father was raping you, but you never told anyone about it?" MC answered, "I really tried hinting. I didn't directly tell anyone like I'm doing it right here right now, but there were tons of red flags."

The State's other witnesses were two law enforcement officers, Investigator Jeremy Lea with the 18th West Drug Task Force and Montgomery County Sheriff's Department Investigator Greg Harmon. They testified regarding the investigation that occurred because of MC reporting the abuse at the hospital.

On the basis of MC's reported drug overdose, the investigators obtained a warrant to search Herrington's house. Upon arrival, Investigator Lea read Herrington his rights and took a statement from him. Herrington volunteered that his drugs—Norco and methamphetamine—were kept in the shed because he has small children in the house. Investigator Lea searched the shed and found three loaded syringes. The Arkansas State Crime Laboratory tested one of those syringes and determined that the substance loaded in it was methamphetamine.

After securing the syringes from the shed, investigators began to search the house. Investigator Lea found a closet that contained a chair with ropes tied to it. Both the chair and the ropes appeared to be stained with blood. As a result of this observation and MC's

report of rape, Investigator Lea obtained a second warrant to search for DNA evidence and other evidence related to the rape allegations.

In the subsequent search, investigators seized several articles of clothing, bedding, items thought to have blood on them, and other items of potential evidentiary value. Several items were tested by the Arkansas State Crime Laboratory. The chair had MC's blood on it and MC's DNA was found on the rope. A pair of women's underwear was found to contain both Herrington's sperm cells and MC's blood.

Both Investigators Lea and Harmon interviewed Herrington. Herrington denied raping MC. He claimed, instead, that she had raped him. Herrington said that on more than one occasion when he was asleep, he woke up feeling wet and found MC grinding on top of him. He noted that the closet with the chair and bindings was his "war room." He claimed that he used the war room to have private moments to masturbate and read his bible. Herrington admitted hitting MC. He further noted that he had a video on his phone of MC performing oral sex on another person. He told investigators that MC was highly sexual because of her methamphetamine use. He noted that he learned from "tweakers.com" that methamphetamine is a highly sexual drug.

The investigators also seized letters Herrington tried to write to MC from jail. In the first letter, Herrington professed his love for MC, apologized for hitting her, and forgave her for everything. He noted that he is "facing a couple of decades of prison time, maybe even life[.]" Herrington stated that he would gladly serve ten lifetimes for MC. In another note,

Herrington stated that someone named "Ken" "couldn't believe I'm being jailed for [r]ape and [b]eating you!"

In another note, Herrington wrote that a picture of MC made him cry and smile. He wrote, "Damn[,] how did you get to be so beautiful? You are better looking than your mother or I ever thought to be." He told MC, "[Y]ou can solve this. Our family is in your hands." He asked her to "bring us together, not tear us apart." And he asked MC to "please make us whole again! Bring us all back together, you and only you have this power." Herrington included the following postscript: "Come Home [and] I will get you a Pot Card! I can't cash checks in Prison!" Similarly, in another letter, he told her that "[i]f I ever get out I will give you the truck [,] [a]ll our stones, [and] artifact[]s."

After the State rested, Herrington moved for directed verdict. As to the first rape charge, Herrington argued that "[t]he [S]tate has not presented sufficient evidence to reach the conclusion without conjecture that Robert Herrington engaged in sexual intercourse with [MC] and that [MC] was less than fourteen years of age at the time of the offense[.]" Regarding the charge of introducing a controlled substance into the body of another, Herrington argued that the State had to prove that MC "did not know or consent that she was being injected, and her testimony was that she did know, that she did not consent, but she did know that she was being injected." Finally, Herrington argued that "there also hasn't been sufficient testimony to demonstrate possession of methamphetamine." The circuit court denied these motions.

The defense rested without putting on any evidence. Herrington renewed his motions for directed verdict on all charges, which the circuit court again denied.

The jury found Herrington guilty on all five counts and returned sentences of forty years each for the two counts of rape and the one count of introduction of a controlled substance into the body of another. The jury also sentenced Herrington to one year on the domestic-battering charge and six years on the methamphetamine-possession charge. The jury recommended that the forty-year sentences run consecutively and that the other sentences run concurrently. The circuit court sentenced Herrington in accordance with the jury's recommendations in a sentencing order that was filed on January 29, as amended in sentencing orders filed on January 30 and February 9. All three versions of the sentencing order assessed Herrington a "PA COPY EXPENSE" of $191.60. Herrington filed a timely notice of appeal on February 22.

II. *Discussion*

A. Sufficiency of the Evidence Supporting the Rape-Under-Fourteen Conviction

On appeal, a motion for directed verdict is treated as a challenge to the sufficiency of the evidence. *Dortch v. State*, 2018 Ark. 135, at 5, 544 S.W.3d 518, 522. Appellate courts will affirm the conviction if there is substantial evidence to support it. *Id*. Substantial evidence is that which is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other, without resorting to speculation or conjecture. *Id*. When reviewing a challenge to the sufficiency of the evidence, this court views the evidence in the light most favorable to the State, considering only the evidence that supports the guilty

10

verdict. *Sweet v. State*, 2011 Ark. 20, at 9, 370 S.W.3d 510, 518. The evidence, whether direct or circumstantial, is substantial if it compels a conclusion and passes beyond mere suspicion or conjecture. *Id.*

Herrington was charged with one count of rape for allegedly having sex with MC when she was less than fourteen years old. He submits that there was insufficient evidence to support the conviction because there was no evidence that MC was less than fourteen at the time of the charged acts.

Herrington acknowledges MC's testimony that she lived with him in Montgomery County when she was between the ages of thirteen and seventeen, but he maintains that she did not testify about (1) any purported sexual contact that occurred before she turned fourteen; (2) her age when the purported sexual contact began; or (3) any specific age she was when the charged acts allegedly occurred.

In *Goins v. State*, the alleged victim testified that at least one of the seven sexual encounters she described occurred before her fourteenth birthday. 2019 Ark. App. 11, at 3, 568 S.W.3d 300, 302–03; *see also Moss v. State*, 2010 Ark. App. 395 (victim testified that the defendant had sex with her on at least two specific times before her fourteenth birthday). Herrington notes there was no such testimony here and maintains there was thus insufficient evidence that MC was less than fourteen at the time of the charged acts and that his rape-under-fourteen conviction must be reversed and dismissed.

We disagree. As charged in count one of this case, a defendant commits rape when he engages in sexual intercourse or deviate sexual activity with another person who is less

than fourteen years old. *See* Ark. Code Ann. § 5-14-103(a)(3)(A) (Repl. 2024). A rape victim's testimony is not required to be corroborated, and the victim's testimony alone describing the acts can constitute sufficient evidence to sustain a conviction. *See Roberts v. State*, 2024 Ark. App. 143, at 8, 686 S.W.3d 69, 74.

We hold that the circuit court did not err in finding that MC's testimony provided sufficient evidence that the rapes started before she turned fourteen. The State began its examination of MC regarding the first rape by asking her about when she was thirteen years old. The State then had MC testify that she was raped by her father. The jury could infer from this sequence, without resort to speculation, that the rape occurred when MC was thirteen. *See, e.g., Burris v. State*, 2023 Ark. App. 212, at 5, 665 S.W.3d 259, 263 (holding that the jury is not required to abandon common sense and is entitled to draw reasonable inferences from the evidence). This testimony was sufficient to meet the age element of the crime.

Further, on cross-examination, Herrington's counsel asked MC, "So for five years your father was raping you, but you never told anyone about it?" MC answered, "I really tried hinting. I didn't directly tell anyone like I'm doing it right here right now, but there were tons of red flags."

Considering this testimony with MC's prior testimony that she lived with her father from the ages of thirteen to seventeen, the jury could infer without resort to speculation or conjecture that the rapes started when she was thirteen years old. Therefore, the evidence supports Herrington's rape conviction, and we affirm on this point.

B. Sufficiency of the Evidence Supporting the
Introduction-of-a-Controlled-Substance Conviction

Herrington argues that we must reverse his conviction for introduction of a controlled substance because the use of the phrase "without that other person's knowledge *or* consent" in Arkansas Code Annotated section 5-13-210(f) (Repl. 2024) (emphasis added) should be construed to mean that the State was required to prove both that MC lacked knowledge of what the controlled substance was and that she did not consent to the injection of the controlled substance.

Herrington's argument hinges on the interpretation of the word "or." He acknowledges that in its ordinary sense, the word "or" is a disjunctive particle that marks an alternative that generally corresponds to "either," as in "either this or that"; it is a connective that marks an alternative. *See S. Pioneer Prop. & Cas. Ins. Co. v. Sharrah*, 2024 Ark. App. 301, at 9, 688 S.W.3d 184, 190. This court reads statutes "according to the natural and most obvious import of the language without resorting to subtle and forced constructions for the purpose of either limiting or extending their operation." *Bd. of Trs. of the Ark. Pub. Emps. Ret. Sys. v. Garrison*, 2019 Ark. App. 245, at 8, 576 S.W.3d 485, 491 (citing *Hines v. Mills*, 187 Ark. 465, 467, 60 S.W.2d 181, 182 (1933)). We exchange "or" for "and" in a statute only when "the context requires that it be done to effectuate the manifest intention of the Legislature or where not to do so would render the meaning ambiguous or result in an absurdity." *Id.*

Herrington argues that the interpretation of "or" in this case must be read to mean "and," such that the State had to prove that the injection of the controlled substance was without MC's knowledge *and* consent. He cites no Arkansas case in which we have applied that rule in this context, and in light of the above-referenced rules of statutory construction, we cannot conclude that his interpretation is correct. To interpret the phrase "knowledge or consent" to mean "knowledge and consent," in this context, would render "or consent" superfluous, which we do not do. *See Stalik v. State*, 2025 Ark. App. 235, at 7, __ S.W.3d __, __ (construing the statute so that no word is left void, superfluous, or insignificant, and meaning and effect are given to every word in the statute if possible).

Our review of the record confirms that MC testified that she knew the substance being injected into her arm was methamphetamine, but she did not consent to its injection:

STATE: What did he inject you with?

MC: Methamphetamines.

STATE: Did you want him to do that?

MC: No. I was pulling my arm away and he just kind of laid there on top of me, holding me down so I couldn't move it back.

We hold that the State therefore presented sufficient evidence that MC was injected with methamphetamine without her consent, which we hold is sufficient to meet the statutory requirement of section 5-13-210(f).

Herrington argues alternatively that there was insufficient evidence that he introduced a controlled substance with the purpose of committing a felony sexual offense.

14

We do not reach this argument because Herrington failed to preserve it for appellate review. To challenge the sufficiency of the evidence, a defendant must make a directed-verdict motion. Ark. R. Crim. P. 33.1(c) (2024). The motion "must specify the respect in which the evidence is deficient." *Id.* "Parties may not change their argument on appeal and are limited to the scope and nature of their arguments made below." *Hunter v. State*, 330 Ark. 198, 203, 952 S.W.2d 145, 148 (1997). Failure to make a directed-verdict motion "with specificity regarding the sufficiency issue on appeal equates to the motion never having been made." *Maxwell v. State*, 373 Ark. 553, 559, 285 S.W.3d 195, 200 (2008).

Our review of the record confirms that Herrington did not challenge the purpose-to-commit-a-felony-sex-offense element in his directed-verdict motion. Therefore, this argument is barred on appeal. *See, e.g., Daniels v. State*, 2019 Ark. App. 507, at 4, 588 S.W.3d 407, 409.

### C. Potential Immunity-from-Possession Conviction Pursuant to Arkansas Code Annotated Section 20-13-1704

Herrington next argues that we must reverse his conviction for possession of a controlled substance because he was immune from a drug possession that resulted from his reporting an overdose under the Joshua Ashley-Pauley Act. The statute provides that an individual cannot be "arrested, charged, or prosecuted for possession of a controlled substance . . . if the evidence for the arrest, charge, or prosecution . . . resulted solely from seeking medical assistance" for another person experiencing an overdose. Ark. Code Ann. § 20-13-1704(a) (Repl. 2023). A drug overdose is an acute condition with symptoms apparent to a reasonable person that include, but are not limited to, severe illness, loss of

15

consciousness, or coma. Ark. Code Ann. § 20-13-1703(1) (Repl. 2023). Emergency medical assistance is defined as aid given "by a healthcare provider" to a person "experiencing or believed to be experiencing" a drug overdose. *Id.* § 20-13-1703(3).

Herrington submits that at the point that he reasonably believed MC was experiencing an overdose, he called 911 and rushed her to the hospital for medical assistance. Even MC testified to this. While MC received medical aid, a search warrant was issued for Herrington's home. Herrington was then charged with possession, after police found drugs in his shed. This occurred before law enforcement had knowledge of the rape allegations. Herrington was subsequently charged with and convicted of possession of a Schedule II controlled substance.

Herrington asserts that because he was seeking medical assistance for MC's drug overdose, he was immune from arrest, charge, and prosecution. He argues that he should never have been charged with possession and that we must reverse his possession conviction because he was immune from prosecution pursuant to Arkansas Code Annotated section 20-13-1704.

Once again, Herrington's argument is not preserved for appeal. To preserve an argument for appeal, an appellant must make an objection to the circuit court that is sufficient to apprise the court of the error alleged. *Gulley v. State*, 2012 Ark. 368, at 6, 423 S.W.3d 569, 575. An appellate court "will not address arguments raised for the first time on appeal." *Id.* Because Herrington did not raise this argument below, we do not consider it on appeal.

16

D. Imposition of $191.60 Copy Expense

Herrington next argues that we must reverse and dismiss the $191.60 "PA COPY EXPENSE" because there is no statutory basis for its imposition. *See* Ark. Code Ann. § 16-10-305(d) (Supp. 2023) (providing that no court costs shall be assessed that are not provided for by state law). The sentencing order notes the imposition of the fee; however, Herrington is correct in asserting that there is no statute authorizing a circuit court to order reimbursement to the prosecuting attorney for copies made as a fee associated with a criminal conviction. The State concedes that the imposition of the fee should be reversed. Accordingly, as to this point, we reverse the imposition of the copy expenses and remand to the circuit court with instructions to strike the part of the sentencing order that awarded the State copying expenses in the amount of $191.60.

E. Objections to State's Voir Dire Questions Regarding the Facts of the Case

Finally, Herrington argues that the State improperly discussed the particular facts of the case during voir dire in an attempt to compel the jurors to believe MC, to prejudice the jury against him, and to argue the case. He points out that the prosecutor informed the jury panel there would be few eyewitnesses to the alleged offenses and that MC waited a long time to disclose the abuse but that this information did not take away from the truth of MC's allegations. Herrington, citing *Adams v. State*, 2020 Ark. App. 107, at 11, 495 S.W.3d 884, 891, argues that this line of questioning by the State invaded the province of the jury as the arbiters of credibility.

17

We disagree and hold that the circuit court did not abuse its discretion by permitting the State's voir dire examination. "The conduct of voir dire is left to the broad discretion of the trial court." *Hutcheson v. State*, 92 Ark. App. 307, 318, 213 S.W.3d 25, 32 (2005). "Unless the trial court's discretion is clearly abused, it will not be reversed." *Id.* "The purposes of voir dire examination are to discover if there is any basis for challenges for cause and to gain knowledge for the intelligent exercise of peremptory challenges." *Id.* at 317, 213 S.W.3d at 32. Accordingly, prospective jurors may be questioned about their mental attitudes toward certain types of evidence. *Id.* For example, in *Hutcheson*, we affirmed a circuit court's decision to permit voir dire questions such as (1) "whether a mother should be held accountable if something happened to her baby while she was passed out after taking methamphetamine"; (2) "whether the jurors agreed that teachers have a duty to protect children while they are in their custody"; and (3) "whether the jurors agreed that our society has established laws to protect children because they cannot protect themselves." *Id.*

The voir dire topics Herrington highlights in his brief are similar to those in *Hutcheson*, *supra*. They were developed to determine whether the potential jurors understood the State's burden of proof—particularly whether they could convict solely on the basis of a victim's testimony. Further, the questions probed the potential jurors' opinions on whether they would be biased against a victim because of delayed reporting of the alleged abuse. Exploring these key issues was a proper use of voir dire. *See id.* at 318, 213 S.W.3d at 32 (stating that because the State was merely posing questions to the jury to establish that the

18

jury pool understood the concept of parental duty, a key issue in that case, the questions were a permissible use of voir dire examination).

Moreover, Herrington has failed to demonstrate any prejudice to his case by the State's use of voir dire. When he did object to various questions and comments by the State, the circuit court granted Herrington relief. The State was directed to move on from the topic it was discussing and instructed not to discuss the specific facts of the case. Herrington did not request further relief in the form of an admonition or a mistrial. Therefore, this court can find no prejudice; accordingly, we affirm. *See Sanders v. State*, 278 Ark. 420, 422, 646 S.W.2d 14, 15 (1983) (holding that although the circuit court permitted the prosecuting attorney to go beyond the purpose of voir dire, there was no motion for a mistrial or admonition and therefore no prejudicial error occurred); *see also Hutcheson*, 92 Ark. App. at 318, 213 S.W.3d at 32.

Accordingly, we affirm the conviction, but we reverse the award of costs in the amount of $191.60 in copying fees and remand with directions to strike the costs from the sentencing order in accordance with this opinion.

Affirmed in part; reversed and remanded in part.

THYER and WOOD, JJ., agree.

*Lassiter & Cassinelli*, by: *Michael Kiel Kaiser*, for appellant.

*Tim Griffin*, Att'y Gen., by: *Joseph Karl Luebke*, Ass't Att'y Gen., for appellee.