Howard MARCUM *v.* STATE of Arkansas

CR 88-196                                        771 S.W.2d 250

Supreme Court of Arkansas
Opinion delivered May 30, 1989

*Bradley C. Crawford,* for appellant.

*Steve Clark,* Att'y Gen., by: *J. Denhammcclendon,* Asst. Att'y Gen., for appellee.

STEELE HAYS, Justice. Appellant Howard Marcum was convicted of rape and first degree sexual abuse for offenses involving his daughters *A*, aged 13, and *B*, aged 16. Appellant has appealed from the judgment sentencing him to life and ten years for the crimes. Three points of error are presented: The trial court erred in permitting a social worker to describe a profile of sexually abused children, in allowing a physician to testify that the victim had been sexually active and in limiting defense counsel's cross-examination. Finding no error, we affirm the judgment entered on the convictions.

## The Facts

The facts are summarized in the following narrative: Barbara and Howard Marcum married in 1972. Each had children

by prior marriages and the couple had four children of their own. Howard's work as a welder kept him away at times.

Around the end of 1985, *A*, who was then ten or eleven, intimated to her mother that her father was sexually abusing her. Barbara confronted Howard and threatened divorce. Howard denied the charges and privately urged the child to tell her mother they were untrue, which she did.

At another time Barbara Marcum discovered that *A* and her 18 year old half brother, Stacey Hackwith, had been in bed together. The three of them talked about it tearfully, with Barbara stressing that such things were very wrong. Prompted by that discussion *A* told her mother about having sexual intercourse with her father. Together they addressed Howard who angrily denied the accusations and blamed Barbara for believing them. Barbara told her daughter if the charges were true she would see that something was done about it but if not, much harm could result. Her father told *A* he could go to jail and the family would break up and again she told her mother she had lied.

Around January 1, 1988, *B*, Howard Marcum's daughter by an earlier relationship, came to live with the Marcums. She was then sixteen years old and had not seen her father since she was two. On the morning of February 3 Howard Marcum came into *B*'s bedroom and began fondling her breasts and genitals. She resisted these advances and insisted that he leave. He did but later returned and forcibly fondled her again. When *B* continued to resist he went into a rage and told her to pack her things. When she put her bags in the truck he refused to let her leave and eventually she fled, frightened and crying, to a neighbor's house where she called her stepmother, who made arrangements for her to stay with a friend. On the following day *B* reported the events to the police and to Ms. Debbie Palsrud of the Arkansas Department of Human Services. Ms. Palsrud contacted *A* at school to inquire about her relationship with her father. At that point the child denied any sexual contact with her father.

On February 8, 1988, Howard Marcum was arrested for sexual abuse of *B*. About a week later Barbara Marcum and her daughter talked again and Barbara pointedly asked for the truth. The child told her that her father had been having sexual intercourse with her regularly since she was seven or eight. Mrs.

Marcum called the police and told them her daughter would be coming in to make a statement regarding the matter. This was done within a day or two and additional charges were filed against Howard Marcum. Howard Marcum testified in his own behalf and denied any improprieties with either daughter.

Called by the state, Dr. Thomas J. Simpson testified that he was a board certified gynecologist with twenty-eight years of practice, including extensive experience in rape and sexual abuse. He examined *A* on February 22, 1988, and took a history from her that her father had been having sex regularly with her over a period of seven years up to and including the previous month. She told him that except for her father she had had sexual relations eight times. He described the opening of the vagina as "very relaxed" and compatible with her having had sexual relations more or less on a long-term basis and not just of "very recent origin." His findings were, he said, consistent with long-term repeated sexual relations and not just seven or eight times. Asked how he made that distinction, Dr. Simpson answered:

> The opening to the birth canal we call the introitus and birth canal. In her case, it's very relaxed. It admits two to three fingers and the hymenal ring showed evidence of having been penetrated at some point in time where there were tears, but they were old, healed and the amount of relaxation in the opening is certainly more compatible with someone who has had sexual relations on a longer term basis than just a few encounters . . . People who have had sexual relations and marital status over a period of years will be very similar to what we observed with this patient.

Such condition could not, he stated, be attributed to frequent masturbation.

Ms. Palsrud testified about her background, training and experience in the investigation of child abuse. When she was asked if there was a recognizable pattern of behavior by children subjected to sexual abuse, defense counsel objected to her testifying as an expert. The objection was overruled and Ms. Palsrud proceeded to discuss child sexual abuse in general. She said that after interviewing the older child at the police station, she contacted Barbara Marcum about other possible victims and was told she needed to talk to the younger daughter. When she

spoke with *A* at school the child was shocked, confused and angry, and denied any inappropriate contact with her father. Ms. Palsrud said *A* wanted to know what would happen if she said anything and whether she would have to go to court. Counsel for appellant again objected, this time on the basis of hearsay, and renewed the argument that the witness did not have the qualifications of an expert. The trial judge stated that he had already recognized Ms. Palsrud as expert, but would sustain the objection.

I

The Trial Court Erred In Allowing Testimony Of The Social Worker, Stating That The History Given By The Victim Was Consistent With The Profile Of Sexual Abuse Victims.

The only objections before the trial court to the testimony of Ms. Palsrud was on the basis of hearsay and to her qualifications as an expert. The argument on appeal, however, is that it was error to permit Ms. Palsrud to testify that the history given by *A* was consistent with the profile of sexual abuse victims. Appellant cites the case of *Russell v. State*, 289 Ark. 533, 712 S.W.2d 916 (1986), where it was held to be error for a psychologist to testify that the history given by a victim was consistent with sexual abuse of a child, the reason being that no opinion of an expert was needed, inasmuch as the matter was not beyond the common knowledge and comprehension of the jury. We found, however, that because there was overwhelming evidence of guilt, the error was harmless.

We need not decide whether the facts of this case were such that an opinion of an expert might have been more useful to the jury, or whether, as in *Russell*, the error was harmless, because appellate review of evidentiary rulings of the trial court is limited to the specific legal issue raised by the objection of trial counsel and it is well settled that an appellant may not object in the trial court on one ground and argue another ground on appeal. *Fretwell* v. *State*, 289 Ark. 91, 708 S.W.2d 630 (1986).

II

The Trial Court Erred In Allowing Testimony By A Medical Doctor Stating That The Victim Had Been Sexually Active

For A Number Of Years.

Appellant maintains that it was error to permit Dr. Simpson to testify that *A* had been sexually active. If such evidence were offered by the defense, it is clear that its introduction would be subject to the rape shield statute requiring the defendant to make a timely motion in writing and to establish admissibility in accordance with the statute. Ark. Code Ann. § 16-42-101(c)(10) (1987). *Fields* v. *State*, 281 Ark. 43, 661 S.W.2d 359 (1983); *Duncan* v. *State*, 263 Ark. 242, 565 S.W.2d 1 (1978). But the rape shield statute applies to evidence offered by the defense and thus a different problem arises when such evidence is offered by the state.

Appellant relies solely on *Brewer* v. *State*, 269 Ark. 185, 599 S.W.2d 141 (1980). But the cases are palpably distinguishable. In *Brewer*, the appellant was convicted of rape and kidnapping. The proof was that the victim and her boyfriend stopped at a service station. When the boyfriend went to the restroom, the appellant, armed with a pistol, got in the car and ordered the victim to drive away. The appellant directed her to a secluded area where she was raped. The appellant then took the wheel but was soon apprehended when he stopped at a traffic light. The victim sustained lacerations to the hymenal ring which were bleeding when she was examined following the assault. There was blood on the appellant's clothing and on the back seat of the car. Appellant's version was that the victim had asked him for directions, and when she could not understand him he offered to drive her to the location. He claimed he had only been in the car some three blocks when stopped by the police. While questioning the victim on direct examination the prosecutor elicited from her that she had never had sexual intercourse previously. Appellant moved for a mistrial which was refused and the refusal was cited on appeal as reversible error. The argument was rejected in this language:

> It makes no difference whatsoever whether the victim of rape was a virgin or a prostitute. The offense of rape is committed if the person engages in sexual intercourse or deviate sexual activity with another person by forcible compulsion. Therefore, prior sexual conduct has no relevancy to the issue in question. We do not think the

prejudice was so great as to call for a mistrial, and we think the court acted properly in continuing the trial after admonishing the jury to disregard the improper question and answer.

In the context of the *Brewer* case that was undoubtedly correct — whether the victim was or was not a virgin was irrelevant to any disputed issue of fact. Appellant and the victim were total strangers to each other and the victim's sexual history was entirely beyond the scope of the trial.

■ It does not follow, however, that such evidence is invariably irrelevant. When a female at the very threshold of puberty maintains that her father has been having sexual intercourse with her on a regular basis, sometimes as often as two or three times a week since early childhood, medical evidence that the child demonstrates physical characteristics consistent with prolonged sexual activity has an unmistakable relevance to the factual issue.

While we find no cases of our own touching directly on this subject, cases from other jurisdictions offer some guidance. The sexual history of the victim is frequently said to be irrelevant in rape and sexual abuse, however, the recitation of the rule is often framed in equivocal language such as, "usually," or "generally." In *Fields* v. *State, supra*, for example, this court stated that it was not "relevant per se." In *State* v. *Garcia*, 673 P.2d 955 (Ariz. 1983), the court held that testimony by a physician that the victim stated to him that she had never had sexual intercourse before the alleged rape had relevance to show that sexual intercourse had occurred on the night in question. In *People* v. *Johnson*, 671 P.2d 1917 (Colo. App. 1983), the court held it was not error for the physician and victim to testify that the victim was a virgin, reasoning that while the Colorado rape shield statute presumes such evidence to be irrelevant, the statute does not specifically prohibit the victim from testifying to the absence of prior sexual activity. In *Forrester* v. *State*, 440 N.E.2d 475 (Ind. 1982), a physician testified about the condition of the victim's external genitalia and that her hymen was recently torn. The defendant argued that this proof was inadmissible because it permitted the jury to infer virginity. The court rejected this challenge, pointing out that the rape shield statute was designed

to shield the victim, not the accused. In *State* v. *Singleton*, 691 P.2d 67 (N.M. App. 1984), testimony by the victim that she pleaded with the defendant not to rape her because she was a virgin was held to be harmless error. In *Jenkins* v. *State*, 274 S.E.2d 618 (C.A. Ga. 1980), the court rejected an argument by appellant that the trial court should have declared a mistrial when a physician testified the victim was a virgin, holding that the evidence was relevant under the circumstances of the case. See also *Darrow* v. *State*, 451 So.2d 394 (Cr.App. Ala. 1984), *State* v. *Puyatt*, 315 S.E.2d 574 (W. Va. 1984), and *Oswald* v. *State*, 715 P.2d 276 (Ala. App. 1986).

■ Furthermore, we have previously held that this specific type of evidence is relevant. "[W]e will allow such testimony to show similar acts with the same child or other children in the same household when it is helpful in showing 'a proclivity toward a specific act with a person or class of persons with whom the accused has an intimate relationship.'" *Free* v. *State*, 293 Ark. 65, 732 S.W.2d 452 (1987), quoting from *White* v. *State*, 290 Ark. 130, 717 S.W.2d 784 (1986).

■ We conclude that in the context of this case the testimony of Dr. Simpson was relevant and, therefore, its admissibility is governed by A.R.E. Rule 402 and 403. These rules provide that all relevant evidence is admissible unless its probative value is substantially outweighed by the danger of unfair prejudice. The trial court made that determination in this case by weighing those considerations and deciding that the medical proof offered by the state was not substantially outweighed by the danger of unfair prejudice, at the same time he elected to permit the defendant to counteract that evidence by proof of the sexual history of the victim which would ordinarily have been barred by the rape shield statute. We cannot say that handling of the issue was wrong or that the discretion applicable to evidentiary rulings of the trial court was abused.

## III

The Trial Court Erred In Limiting Defense Counsel's Cross-Examination Of Purported Rape Victim To Incidents Of Masturbation And Sexual Activity With Two Other Persons.

Pursuant to the rape shield statute, Ark. Code Ann. § 16-42-101 (1987), the appellant moved to permit the introduction of evidence of prior sexual activity between the prosecutrix and other persons to rebut proof by the state of her sexual maturity. The defense proposed to prove masturbation by *A* and acts of sexual intercourse between *A* and Stacey Hackwith, her half brother, and with another individual. At a pretrial hearing the trial court held that the defense would be permitted to offer this proof. When questioned on direct and on cross-examination *A* denied the accusations of masturbation but testified with evident candor that she had had intercourse on a single occasion with Stacey Hackwith and on a daily basis for exactly one week with an unnamed boyfriend.

■ On appeal the appellant contends he should not have been restricted to the foregoing incidents, that he should have been permitted to offer additional proof. We must reject the argument because we find no proffer in the record of the evidence which the appellant proposed to introduce. Whether an appellant is a defendant making a tender under the rape shield statute, or a litigant in general, there must be a proffer in order to obtain a reversal on the basis of a wrongful exclusion of evidence. We have often said we will not reverse a case for another trial only to find that the appellant could not produce the evidence he maintains was wrongly rejected in the first trial, or that such proof is lacking in substance. He must, in other words, demonstrate that he was prejudiced by the exclusion of available evidence. *Duncan* v. *State*, 263 Ark. 242, 565 S.W.2d 1 (1978); *Hill* v. *State*, 250 Ark. 812, 467 S.W.2d 179 (1971).

For the reasons stated, the judgment is affirmed.

HICKMAN, J., concurs.

DARRELL HICKMAN, Justice, concurring. For centuries a deep prejudice has existed against women who bring rape charges. The embarrassment and humiliation which a victim must undergo to prosecute her assailant is well known in legal circles. Victims learn immediately the price they must pay for prosecuting. Even the enactment of protective legislation for rape victims and the more sensitive and sensible investigation of rape cases have not entirely stamped out prejudice. *See* Ark. Code Ann. § 16-42-101 (1987). The classic defense to a rape case is still

to discredit the victim. While a woman no longer has to be dead or produce a severely beaten body to get justice against her assailant, we have not entirely buried our prejudice that somehow the rape victim is partially to blame for the crime.

The same prejudice exists in cases involving child abuse, although with a different twist. In child abuse cases, we do not want to believe it happens. That prejudice, in my mind, led to our decision in *Midgett* v. *State*, 292 Ark. 278, 729 S.W.2d 410 (1987), where a majority of this court would not accept strong evidence that a father beat his child to death and his conviction for first degree murder should have stood. It was decided, surely, he did not intend to kill his own child, while the evidence said he did. That same view can lead us to deny the use of relevant and competent evidence that ought to be admissible in a child abuse case.

I write to point out that the testimony of the social worker in this case was admissible. The appellant uses our decision in *Russell* v. *State*, 289 Ark. 533, 712 S.W.2d 916 (1986), to argue that it was not admissible. (Actually, the *Russell* opinion was only a two man opinion; two justices dissented, two justices concurred, and the chief justice did not participate. *Russell*, therefore, is hardly precedent.) The erroneous statement in the *Russell* case is: "Lay jurors were fully competent to determine whether the history given by the victim was consistent with sexual abuse."

The weight of the authority is to the contrary. Jurors are ordinarily not familiar with child abuse, and expert testimony, such as that offered in this case, should be admissible to aid the jurors in their decision. Any juror, who has had personal experience with child abuse, would probably be excused from the panel.

In *State* v. *Myers*, 359 N.W.2d 604 (Minn. 1984), Dr. Clare Bell, a clinical psychologist, testified at length about incest and general characteristics that exist in sexually abused children. The court made these observations:

> The nature . . . of the sexual abuse of children places lay jurors at a disadvantage. Incest is prohibited in all or almost all cultures, and the common experience of the jury

> may represent a less than adequate foundation for assessing the credibility of a young child who complains of sexual abuse . . . .

> In the case of a sexually abused child, consent is irrelevant and jurors are often faced with determining the veracity of a young child who tells of a course of conduct carried on over an ill-defined time frame and who appears an uncertain or ambivalent accuser and who may even recant. Background data providing a relevant insight into the puzzling aspects of the child's conduct and demeanor which the jury could not otherwise bring to its evaluation of her credibility is helpful and appropriate in the cases of sexual abuse of children, . . . and particularly of the children as young as this complainant.

In *U.S.* v. *St. Pierre*, 812 F.2d 417 (8th Cir. 1987), the district judge allowed a clinical psychologist, Dr. Curran, to testify about certain traits and characteristics of sexually abused children, as compared to those exhibited by the victim. The Eighth Circuit Court of Appeals upheld the testimony commenting:

> These cases present difficult problems for the jury. The testimony of the accused and the victim is generally in direct conflict. The crime is secretive with extreme pressures against revelation, especially when committed in a family setting.

Citing the case of *State* v. *Myers*, *supra*, the Eighth Circuit Court of Appeals went on to say:

> That court [Minn.] recognized that the type of testimony presented by Dr. Curran could be very helpful because jurors are at a disadvantage when dealing with sexual abuse.

In *State* v. *Middleton*, 294 Or. 427, 657 P.2d 1215 (1983), the court dealt with expert testimony of a juvenile counselor and a social worker about child abuse. The court said:

> [I]n this instance we are concerned with a child who states she has been the victim of sexual abuse by a member of her family. The experts testified that in this situation the young

> victim often feels guilty about testifying against someone she loves and wonders if she is doing the right thing in so testifying. It would be useful to the jury to know that not just this victim but many child victims are ambivalent about the forcefulness with which they want to pursue the complaint, and it is not uncommon for them to deny the act ever happened. Explaining this superficially bizarre behavior by identifying its emotional antecedents could help the jury better assess the witness' credibility.

The court upheld the admissibility of the testimony. The Supreme Court of Nevada has come to the same conclusion. *Smith* v. *State*, 100 Nev. 570, 688 P.2d 326 (1984). *See also State* v. *Petrich*, 101 Wash. 2d 566, 683 P.2d 173 (1984).

We are witnessing a remarkable increase in the number of child abuse cases. Dr. Roland C. Summit, Head Physician, Community Consultation Service, Clinical Assistant Professor of Psychiatry, Harbor-UCLA Medical Center, Torrance, California, wrote about the child sexual abuse syndrome in Summit, *The Sexual Abuse Accommodation Syndrome*, 7 Child Abuse and Neglect, pp. 177-192 (1983):

> Child sexual abuse has exploded into public awareness during a span of less than five years. . . . The summary message in this explosion of information is that sexual abuse of children is much more common and more damaging to individuals and to society than has been acknowledged by clinical or social scientists.
>
> . . . .
>
> The explosion of interest creates new hazards for the child victim of sexual abuse since it increases the likelihood of discovery but fails to protect the victim against the secondary assaults of an inconsistent intervention system. The identified child victim encounters an adult world which gives grudging acknowledgement to an abstract concept of child sexual abuse but which challenges and represses the child who presents a specific complaint of victimization. Adult beliefs are dominated by an entrenched and self-protective mythology that passes for common sense. 'Everybody knows' that adults must pro-

tect themselves from groundless accusations of seductive or vindictive young people. An image persists of nubile adolescents playing dangerous games out of their burgeoning sexual fascination. What everybody does not know, and would not want to know, is that the vast majority of investigated accusations prove valid and that most of the young people were less than eight years old at the time of initiation.

. . . .

> If a respectable, reasonable adult is accused of perverse, assaultive behavior by an uncertain, emotionally distraught child, most adults who hear the accusation will fault the child.

Dr. Summit recites the generally accepted categories of the syndrome, which are secrecy; helplessness; entrapment and accommodation; delayed, conflicted and unconvincing disclosure; and retraction. He bears down on what happens to the child and what the child must face:

> The prevailing reality for the most frequent victim of child sexual abuse is not a street or schoolground experience and not some mutual vulnerability to oedipal temptations, but as unprecedented, relentlessly progressive intrusion of sexual acts by an overpowering adult in a one-sided victim-perpetrator relationship. The fact that the perpetrator is often in a trusted and apparently loving position only increases the imbalance of power and underscores the helplessness of the child.

> Children often describe their first experiences as waking up to find their father (or stepfather, or mother's live-in companion) exploring their bodies with hands or mouth. Less frequently, they may find a penis filling their mouth or probing between their legs. Society allows the child one acceptable set of reactions to such an experience. Like the adult victim of rape, the child victim is expected to forcibly resist, to cry for help and to attempt to escape the intrusion. By that standard, almost every child fails.

> The normal reaction is to 'play possum,' that is to feign

sleep, to shift position and to pull up the covers. Small creatures simply do not call on force to deal with overwhelming threat. When there is no place to run, they have no choice but to try to hide. Children generally learn to cope silently with terrors in the night. Bed covers take on magical powers against monsters, but they are no match for human intruders.

It is sad to hear children attacked by attorneys and discredited by juries because they claimed to be molested yet admitted they made no protest nor outcry. The point to emphasize here is not so much the miscarriage of justice as the continuing assault on the child. If the child's testimony is rejected in court, there is more likely to be a rejection by the mother and other relatives who may be eager to restore trust in the accused adult and to brand the child as malicious.

. . .

Adult prejudice is contagious. Without a consistent therapeutic affirmation of innocence, the victim tends to become filled with self-condemnation and self-hate for somehow inviting and allowing the sexual assaults.

As an advocate for the child, both in therapy and in court, it is necessary to recognize that no matter what the circumstances, the child had no choice but to submit quietly and to keep the secret.

Dr. Summit points out that "[w]hatever a child says about sexual abuse, she is likely to reverse it."

He discusses what has changed:

Sexual abuse of children is not a new phenomenon although its true dimensions are emerging only through recent awareness and study. Children have been subject to molestation, exploitation and intimidation by supposed caretakers throughout history. . . What is changing most in our present generation is the sensitivity to recognize exploitation, to identify blatant inequities in parenting among otherwise apparently adequate families, and to discover that such inequities have a substantial impact on

the character development, personality integration and emotional well-being of the more deprived and mistreated children.

. . . .

In the 1980's we can no longer afford to be incredulous of basic realities of child abuse.

Finally, he discussed what has been learned from experience:

The sexual abuse accommodation syndrome is derived from the collective experience of dozens of sexual abuse treatment centers in dealing with thousands of reports or complaints of adult victimization of young children. In the vast majority of these cases the identified adult claimed total innocence or admitted only to trivial, well-meaning attempts at 'sex education,' wrestling, or affectionate closeness. After a time in treatment the men almost invariably conceded that the child had told the truth. Of the children who were found to have misrepresented their complaints, most had sought to *understate* the frequency or duration of sexual experiences, even when reports were made in anger and in apparent retaliation against violence or humiliation. Very few children, no more than two or three per *thousand,* have ever been found to exaggerate or to invent claims of sexual molestation . . . It has become a maxim among child sexual abuse intervention counselors and investigators that children never fabricate the kinds of explicit sexual manipulations they divulge in complaints or interrogations. . . .

There is no doubt that we are heading in the wrong direction on this subject. Undoubtedly, a majority of other courts would uphold the admissibility of the social worker's testimony. Roe, *Expert Testimony in Child Abuse Cases*, 40 U. Miami L. Rev., 97-113 (1985); Note, *Expert Testimony in Child Sexual Abuse Prosecutions: A Spectrum of Uses*, 68 B.U.L. Rev. 155-1902 (1988). The reason for a trial is to determine the truth. The rules of evidence are the guidelines that allow us to get there. They should not be used as obstacles.

I would also affirm the judgment.