

# ARKANSAS COURT OF APPEALS

DIVISION I
**No.** CR-16-781

|  |  |  |
|---|---|---|
| JERAN KYLER SORUM | | **Opinion Delivered:** June 21, 2017 |
| | APPELLANT | APPEAL FROM THE BENTON COUNTY CIRCUIT COURT [NO. 04CR-14-415] |
| V. | | |
| STATE OF ARKANSAS | | |
| | APPELLEE | HONORABLE BRAD KARREN, JUDGE |
| | | AFFIRMED |

## BART F. VIRDEN, Judge

A Benton County jury convicted appellant Jeran Sorum of rape, second-degree sexual assault, and first-degree computer exploitation of a child. He was sentenced to an aggregate term of twelve years in prison. Sorum argues that (1) there was insufficient evidence to support each of his convictions, (2) his convictions for rape and second-degree sexual assault violate the prohibition against double jeopardy, and (3) the trial court erred in excluding evidence based on the rape-shield statute. We affirm.

### I. *Jury-Trial Testimony*

Sergeant Mike Lira with the Benton County Sheriff's Office testified that the child-abuse hotline received a report from the principal of the Siloam Springs High School about an incident that had occurred off campus involving a student. Lira arranged for a forensic interview of that student, K.G., at the Children's Advocacy Center. Lira said that K.G. disclosed that she had been sexually assaulted by Sorum. Lira's investigation revealed that on

Friday, September 27, 2013, twenty to twenty-five people—mostly teenagers—attended a party at Thomas King's residence and that alcohol was served. The victim was said to have been "extremely intoxicated." While Lira was interviewing witnesses about the party, he learned that there was a video from the party. Lira obtained a search warrant for Sorum's cell phone. The video had been deleted, but a detective retrieved it using new technology. The video depicts Sorum and Andrew ("Drew") Wall in a room with K.G. passed out on a mattress. Lira testified to what he thought he heard being said on the video. He attributes the following statements to Sorum:

1. "Wake up. Get in that ass. Oh yeah."

2. "I want to fuck that again, Drew."

3. "Get in there, bitch. If you don't do it, you're the biggest pussy I ever met."

4. "Should we really put a condom on it and fuck her with it? You gotta hold her shorts."

5. "Help me. Put it on the broomstick. Do it now. Start with the condom. Use the condom now."

6. "Give me—give me the fucking condom. Are you going to put it on your dick or not?"

7. "Oh, you're not? See if, uh, hold this. Watch this. This is redneck fucking, dude. Fat bitches have done gone to bed."

Wall testified that he pleaded guilty to computer exploitation of a child in the second degree, and he admitted having told many inconsistent versions of the incident. Wall stated that he and Sorum were intoxicated but were aware that K.G. was "very high." Wall said that he and Sorum were "messing with some cats" in the hallway outside the bedroom where K.G. slept. Wall stated that, before going into the bedroom, Sorum had seen a broom

and had said, "I'm gonna fuck her with this broom." Wall used Sorum's cell phone as a flashlight. Wall stated that the cell phone's battery had died at some point, that he had handed the phone back to Sorum, and that he had gotten a flashlight from his truck and returned to the room. Wall stated that Sorum had put a condom on the broomstick, pulled down K.G.'s pants, and put the broomstick in her vagina. He said that, although she had been sleeping, K.G.'s eyes suddenly opened when the broomstick went inside her. Wall admitted sending the following message to K.G. on Saturday night, September 28, 2013, via Facebook: "Something happened to you that night." When K.G. asked what had happened, Wall wrote, "You got f'd with a broomstick."

Isaac Postoak testified that he pleaded guilty to computer exploitation of a minor. Postoak stated that he had attended King's party, but he denied being in the room with Sorum and Wall. He said that on the following day several friends from school were in his garage smoking K2, which he described as "artificial marijuana that you buy from a store," and talking about the party. Postoak testified that Sorum said that he "had fucked [K.G.] with a broomstick" and that everybody had thought it was a joke until Sorum played a video. Postoak recalled seeing Sorum "poking around at [K.G.]" and putting a condom on a broomstick.

K.G. testified that she was fifteen years old at the time of King's party. She said that she had consumed two or three beers and then switched to a "pretty big" bottle of Everclear that she shared with a friend. She and her friend were dancing inside, and they went outside where it was cooler. K.G. took off her shirt, under which she wore a sports bra. She then got on the ground and started throwing up repeatedly. She said she was dizzy, stumbling,

and "wasn't really aware of what was going on." Her friends helped her inside, undressed her, and put her in the shower because she had thrown up on her clothes and had vomit in her hair. K.G.'s friends then dressed her in sweatpants and a sweater belonging to someone else and took her to a back bedroom where she lay down on a mattress and fell asleep. K.G. said she remembered waking up several times. The first time she awoke, she saw a bowl in front of her with vomit in it. The second time she awoke, Postoak had her hand down his pants, and she had pulled away. The third time she woke up, Manuel Crus had come into the room and was "asking me if I wanted to," to which she had yelled, "No!" She awoke again to find Sorum on top of her with her legs pinned between his, and she turned her head and saw a bright light. K.G. said that she was "pretty certain" Wall was holding a cell phone, which illuminated the room. K.G. said that she was certain that Sorum was on top of her. She said, "Since the flashlight was pointing towards our direction, it made Jeran a lot more clearer than anything else, his curly hair and all of his characteristics from his body." She also testified that she had known Sorum before that night. K.G. said that her sweatpants had been pulled down below her knees and that her vaginal area was "really wet." K.G. stated that, when she awoke the following day, "it really burned to pee." She said that she had suffered no pain while urinating before that night.

Three young men testified about the day after King's party when they were smoking K2 in Postoak's garage. Manuel Crus, who had attended King's party, recalled Sorum saying, "Remember last night? We were all drinking. We were all messed up. I have this video." Crus testified that, while watching the video, "[t]he words out of Jeran's mouth were that he fucked [K.G.] with a broomstick. No mistake about that. I remember it clearly." Brenden

Hyde testified that Sorum was "excited" about showing them the video and said that he had "screwed" or "fucked" a girl with a broomstick. Jeremiah Knifechief testified that Sorum had pulled out his cell phone, showed them a video, and said something to the effect of "screwing a girl with a broomstick."

Sorum took the stand in his own defense. He testified that he was seventeen years old at the time of King's party. He stated that he and others had been videotaping and taking pictures during the party. Sorum testified that he and Wall were intoxicated, that they had wandered into a bedroom, and that Wall had his (Sorum's) cell phone. Sorum said that he first realized K.G. was in the room and passed out when he saw her from the cell phone's light. Sorum said that Wall was recording when they entered the room. He stated that he and Wall were "just kinda goofing around" and "drunkenly exploring." Sorum said that he had taken a kitten and had thrown it on K.G. According to Sorum, K.G. was wearing sweatpants and a sweater and was under a blanket. He testified that Wall had handed him a broom for some reason and that he had begun swinging it around and had hit Wall with it. Sorum recalled that he and Wall had made a lot of noise in their attempts to wake K.G. and that he had eventually begun "prodding" her with the broomstick. He admitted touching her "thigh region." Sorum described K.G. as a friend from school and said that when friends pass out at parties, they "get messed with." He testified that Wall had produced a condom, opened the wrapper, and handed the condom to him. Sorum said that "[w]e did not have any plan that was sexual at all." Sorum said that he had unrolled the condom onto the broomstick, swung it around a few more times, "sort of danced around the room a little more," and then left the room. Sorum said that he left the party soon after that. He said that

the following morning, Wall and a female returned his phone and that he had not even realized that he had forgotten it at the party.

Sorum was asked about the voices on the video. He said, "I have no clue what I meant by 'Get in that ass.' I have no clue if I even said that. I did not hear it." He did not recall saying any of the things on the video testified to by Lira. He said that he did not recall the "redneck fucking" comment but said, "I did hear that. I did hear something along the lines of that. I did hear that. More like what was said was probably like this is redneck shit. The room is redneck. It was trashy redneck. I didn't hear 'This is redneck fucking, dude.' I did not hear that."

Sorum further testified that everyone was smoking K2 in Postoak's garage the following day and talking about how crazy the party had gotten. Sorum started "going through" his cell phone and realized for the first time that there was a video. Sorum said that he had told the other boys, "Let's watch this." He denied saying that he had "fucked," "f'd," or "screwed" a girl with a broomstick. When asked why his good friends would say otherwise, he said that they were either mistaken or lying and maybe trying "to save their own ass." Sorum said that the video was dark and of "crappy quality" and that no one had been excited about watching the video. He said that he had immediately deleted it because they "couldn't see anything really."

Sorum testified that he first began to hear rumors about King's party on Monday, September 30, 2013, at school. On cross-examination, Sorum was shown Facebook messages between him and K.G. The following messages were sent Sunday, September 29:

K.G.:          wtf [what the fuck] jeran I herd wtf u did

SORUM:      wtf did I do

K.G.:      nvm [never mind] its drew talking shit he's saying u fucked me with a broom

SORUM:      Ok well tell drew to stfu [shut the fuck up]

Confronted with the Facebook messages, Sorum conceded that he was aware of the "rumors" before Monday. Sorum denied having conversations with Wall and Postoak about what they needed to say to the cops.

Wall was recalled to the stand. He testified that Sorum had come to his house, had asked him not to cooperate with the police, and had said that they needed to come up with a story together. Postoak was also recalled to the stand. He testified that Sorum had come to speak with him a couple of times about "trying to get together and avoid getting caught up in this mess." Postoak said that Sorum had told him that they should come up with a plan and have the same story "so that this would blow over" and that if he "came up with a lie good enough that we could get out of it."

## II. *Discussion*

### A. Sufficiency of the Evidence

In reviewing a challenge to the sufficiency of the evidence, we view the evidence in the light most favorable to the State and consider only the evidence that supports the verdict. *Burnside v. State*, 2015 Ark. App. 550, 472 S.W.3d 497. We affirm a conviction if substantial evidence exists to support it. *Id.* Substantial evidence is that which is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other, without resorting to speculation or conjecture. *Id.* It is the jury's duty to resolve conflicting testimony and determine the credibility of witnesses. *Id.*

### 1. *Rape*

A person commits rape if he or she engages in sexual intercourse or deviate sexual activity with another person who is incapable of consent because he or she is mentally incapacitated. Ark. Code Ann. § 5-14-103(a)(2)(C) (Supp. 2015). "Deviate sexual activity" means any act of sexual gratification involving the penetration, however slight, of the labia majora or anus of a person by any body member or foreign instrument manipulated by another person. Ark. Code Ann. § 5-14-101(1)(B).

Sorum does not challenge the fact that K.G. was incapable of consent. Below, Sorum challenged the penetration element in the term "deviate sexual activity." On appeal, he also argues that the State failed to prove sexual gratification. This argument, however, is not preserved for our review because it is being raised for the first time on appeal. *Patton v. State*, 2013 Ark. App. 583.

Sorum argues that the only evidence of penetration was from Wall's testimony and that there is no reasonable probability that Wall's version is correct. *Barnes v. State*, 258 Ark. 565, 528 S.W.2d 370 (1975). Wall gave several different versions of the story and denied facts that were beyond dispute, e.g., he supplied the condom. Sorum contends that Wall's testimony was based on a drunken memory from over two years prior to the trial and that the video is the "absolute proof of what took place in the room."

The jury heard Sorum's voice on the video and could have reasonably concluded that Sorum intended to penetrate K.G.'s vagina with the broomstick. Although the video did not depict the penetration, there was testimony that the video stopped abruptly because the battery in Sorum's cell phone had died during the recording. Even without the video,

the jury determines the credibility of witnesses and could have believed Wall's testimony that Sorum penetrated K.G.'s vagina with the broomstick.[1] There was also testimony from several of Sorum's friends—some of whom were reluctant witnesses—that Sorum, when showing them the video, said that he had "fucked," "f'd," or "screwed" K.G. with the broomstick. We hold that there was substantial evidence to support Sorum's conviction for rape.

### 2. *Second-Degree Sexual Assault*

A person commits sexual assault in the second degree if the person engages in sexual contact with another person who is incapable of consent because he or she is mentally incapacitated. Ark. Code Ann. § 5-14-125(a)(2)(C). "Sexual contact" means any act of sexual gratification involving the touching, directly or through clothing, of the sex organs, buttocks, or anus of a person or the breast of a female. Ark. Code Ann. § 5-14-101(10). "Sexual gratification" is not defined in the statute, but our supreme court has construed the words in accordance with their reasonable and commonly accepted meanings. *Farmer v. State*, 341 Ark. 220, 15 S.W.3d 674 (2000).

Again, Sorum does not challenge the fact that K.G. was incapable of giving her consent. Below, he argued that there was no proof of sexual gratification and questioned whether the contact was sexual in nature. Sorum has abandoned his challenge to the element of sexual contact on appeal. *Dillard v. State*, 313 Ark. 439, 855 S.W.2d 909 (1993).

---

[1]Sorum did not argue below or on appeal that Wall was an accomplice whose testimony required corroboration, which precludes our review of the issue. *Bryant v. State*, 2011 Ark. App. 348, 384 S.W.3d 46.

Sorum argues that there was no proof of sexual gratification and that it is "much more plausible" that he was just intoxicated and "messing with K.G." as he had done in the past with party attendees who passed out. He points out that the State's circumstantial evidence must exclude every reasonable hypothesis other than his guilt.

Whether the evidence excludes every other hypothesis is for the jury to determine. *Baca v. State*, 2013 Ark. App. 524. Moreover, it has consistently been held that it is not necessary for the State to provide direct proof that an act is done for sexual gratification if it can be assumed that the desire for sexual gratification is a plausible reason for the act. *Farmer*, *supra*. Considering Sorum's statements on the video and testimony about his excitement when replaying the video for his friends while bragging about what he had done to K.G. with a broomstick, the jury could reasonably conclude that Sorum's actions were taken in an effort to achieve sexual gratification. Moreover, the jury was not required to believe that Sorum was only playing a harmless prank on his friend. We hold that there was substantial evidence supporting Sorum's conviction for second-degree sexual assault.

### 3. *Computer Exploitation*

A person commits computer exploitation of a child in the first degree if the person causes or permits a child to engage in sexually explicit conduct and knows, has reason to know, or intends that the prohibited conduct may be photographed, filmed, reproduced, reconstructed in any manner, including on the Internet, or part of an exhibition or performance. Ark. Code Ann. § 5-27-605(a)(1) (Supp. 2015). "Sexually explicit conduct" means actual or simulated sexual intercourse or deviate sexual activity, among other things. Ark. Code Ann. § 5-27-601(15). "Deviate sexual activity" means any act involving the

penetration, however slight, of the labia majora or anus of a person by any body member or foreign instrument manipulated by another person. Ark. Code Ann. § 5-27-601(7)(B).

Below, Sorum argued that "sexually explicit conduct" must refer to "deviate sexual activity," which requires the element of penetration and that evidence of penetration was lacking. His argument on appeal has changed, and Sorum relies on the subchapter definitions under Ark. Code Ann. § 5-27-302. He argues that K.G. was not engaged in "sexually explicit conduct" as defined by section 5-27-302(4) in that (1) the State alleged that actual conduct occurred—not simulated, and (2) the conduct alleged to have occurred did not make it appear to a reasonable viewer to be "(A) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex, (B) bestiality, (C) masturbation, (D) sadomasochistic abuse for the purpose of sexual stimulation, or (E) lewd exhibition of the genitals or pubic area of any person or the breast of a female." Ark. Code Ann. § 5-27-302(4).

Subchapter 3's title is the "Arkansas Protection of Children Against Exploitation Act of 1979." Ark. Code Ann. § 5-27-301. Subchapter 6 involves computer crimes against minors. Each subchapter has its own definitions section. Although there are similarities, we are dealing with subchapter 6 and not 3. Therefore, we cannot address what amounts to a new argument for the first time on appeal, and Sorum has abandoned his challenge regarding penetration under "deviate sexual activity" as defined by Ark. Code Ann. § 5-27-601(7)(B).

Sorum also argues for the first time on appeal that there was no evidence that he knew, had reason to know, or intended the conduct would be filmed. A directed-verdict motion requires the movant to apprise the trial court of the specific basis on which the

motion is made. *Patton*, *supra*. Arguments not raised at trial will not be addressed for the first time on appeal, and parties cannot change the grounds for an objection on appeal, but are bound by the scope and nature of the objections and arguments presented at trial. *Id*.

### B.  Double Jeopardy

The Fifth Amendment to the United States Constitution provides that no person shall be twice put in jeopardy of life or limb for the same offense. *Hughes v. State*, 347 Ark. 696, 66 S.W.3d 645 (2002). Arkansas's Constitution is similar. Ark. Const. article 2, § 8. When the same conduct of a defendant may establish the commission of more than one offense, the defendant may be prosecuted for each such offense. However, the defendant may not be convicted of more than one offense if one offense is included in the other offense. Ark. Code Ann. § 5-1-110(a)(1). An offense is included in an offense charged if the offense is established by proof of the same or less than all of the elements required to establish the commission of the offense charged. Ark. Code Ann. § 5-1-110(b)(1).

Sorum asserts that second-degree sexual assault is a lesser-included offense of rape and cites this court's decision in *X.O.P. v. State*, 2014 Ark. App. 424, 439 S.W.3d 711. He says, therefore, the trial court violated the prohibition against double jeopardy. Sorum, however, did not move to dismiss on double-jeopardy grounds below. When the argument of double jeopardy was not raised below, we cannot consider that argument on direct appeal. *State v. Montague*, 341 Ark. 144, 14 S.W.3d 867 (2000).

### C.  Rape-Shield Statute

Under Arkansas's rape-shield statute, Ark. Code Ann. § 16-42-101 (Repl. 1999), evidence of a victim's prior sexual conduct is inadmissible by the defendant to attack the

credibility of the victim, to prove consent or any other defense, or for any other purpose.

Ark. Code Ann. § 16-42-101(b); *State v. Rapp*, 368 Ark. 387, 246 S.W.3d 858 (2007). An

exception to this rule exists when the trial court, at an in camera hearing, makes a written

determination that such evidence is relevant to a fact in issue and that its probative value

outweighs its inflammatory or prejudicial nature. *Id*. The purpose of Ark. Code Ann. § 16-

42-101(b) is to shield victims of rape or sexual abuse from the humiliation of having their

personal conduct, unrelated to the charges pending, paraded before the jury and the public

when such conduct is irrelevant to the defendant's guilt. *Taylor v. State*, 355 Ark. 267, 138

S.W.3d 684 (2003). Accordingly, the trial court is vested with a great deal of discretion in

determining whether the evidence is relevant, and we will not overturn the trial court's

decision unless it constituted clear error or a manifest abuse of discretion. *Id*.

Prior to trial, Sorum filed a motion to present evidence under Ark. R. Evid. 411 and

Ark. Code Ann. § 16-42-101 to prove his mistaken-identity defense.[2] Specifically, he

wanted to admit a crime-lab report that he asserts revealed two semen stains that were found

on clothing worn by the victim. One semen sample matched Postoak's DNA profile, and

the other sample came from an unknown source but excluded Sorum as a contributor.

Sorum thus sought to admit the "exonerating DNA test results."

An in camera hearing was held, and defense counsel argued that

> there is unidentified semen stain on this sweatshirt the alleged victim wore the night
> in question . . . we think it happened prior to any interaction between this defendant,
> Drew Wall, the other codefendant, and the alleged victim—at some point Isaac
> Postoak, according to his own testimony and what he's pled to, came in and
> videotaped himself having sex with the alleged victim in this case. And given the fact

---

[2]Arkansas Rule of Evidence 411 involves the admissibility of evidence of a victim's
prior sexual conduct.

that he's one of the sets of semen on this sweatshirt, that would probably make sense if you think about it. He's already pled out so it's not really an issue. I mean, he's not denying he had some form of consensual sex with this girl that night. I think the second set of DNA, which does not match Mr. Sorum's, which is this mystery DNA . . . clearly, it goes to exonerate the fact that if our defense is mistaken identity, this girl was passed-out drunk that night—she doesn't even remember having sex with Postoak at first, only later did she confirm that—then in Postoak's—his description of that particular sexual event mirrors very closely factually what she later in her second and third statements to police, not her first statement—the first statement she dosesn't identify Mr. Sorum at all. She said, some guy came in and I was too drunk to push him off of me. Didn't identify Jeran Sorum or anything. But later she says, oh, I guess I did have consensual sex with Postoak. And Postoak says, oh, yeah, it's consensual. Whatever. That still doesn't account for this mystery DNA on there. And again, if the story is—if her story is going to be well, Jeran Sorum came in and had unconsensual sex with me and/or did something with a broomstick with me, again we're not asking her who she had sex with last week, we're not asking her anything about that, what her sexual knowledge is, we're asking what happened probably within a good 30 minutes it sounds like either before or after this alleged rape . . . I don't care who she had sex with before and I don't care what she did after. That's all we're asking is that narrow probably half-hour window of time. And I don't—I'm not even going to ask her who was the other DNA. I just want the serologist [from] the lab to come up here and say we found two sets of DNA. Whose was it? Postoak and somebody else.

The State argued that it was not alleging sexual intercourse as the method of rape and not alleging that Sorum ejaculated on or in K.G. Rather, the State alleged that Sorum had penetrated K.G.'s vagina with a foreign instrument and therefore evidence about semen was completely irrelevant. Also, the State pointed out that the clothing worn by the victim had been picked up off the floor to dress K.G. "[s]o we don't know if that other semen stain is from an encounter weeks earlier with other people."

The trial court entered an order specifically denying Sorum's "motion to introduce DNA evidence of unknown origin." The trial court found that it clearly violated the rape-shield statute and that the probative value of the evidence was not outweighed by its prejudicial impact.

Subsequent to the in camera hearing, the State filed a motion in limine to exclude any reference to K.G.'s prior sexual contact with Postoak on the bases that it was wholly irrelevant to the charges against Sorum, was excluded by the rape-shield statute, was more prejudicial than probative, and would only confuse and mislead the jury.

At a bench conference during trial, the trial court addressed motions that had not previously been put on the record. The trial court mentioned, among other things, the State's motion in limine to exclude any reference to prior sexual contact between K.G. and Postoak. Defense counsel said, "Same thing, Your Honor, no objection there."[3] The trial court then granted the State's motion.

## 1. *Evidence of DNA on K.G.'s clothes*

The DNA evidence was not relevant given the nature of the State's allegations against Sorum. In *Thacker v. State*, 2015 Ark. 406, 474 S.W.3d 65, the trial court had refused to admit semen samples found on the victim's bedsheet and pillow that did not match Thacker's DNA profile. In rejecting his argument that the trial court erred because the evidence was relevant to his theory that someone other than him was the rapist, our supreme court upheld the ruling, reasoning that, because Thacker had not ejaculated while in the bedroom, evidence of DNA would not be probative to his theory of misidentification. Here, admitting the DNA report would not have exonerated Sorum because the State alleged that he penetrated the victim with a broomstick, thus DNA evidence was not relevant. We cannot say that the trial court abused its discretion in excluding this evidence.

---

[3]"Same thing" refers to defense counsel's earlier statement in response to the State's motion in limine to exclude evidence of prior sexual conduct between K.G. and Sorum. He said, "I'd say that's a belt-and-suspenders after the rape shield motion."

### 2. *Evidence of K.G. having sex at the party*

On appeal, Sorum argues that evidence that K.G. had sex with Postoak at the party would demonstrate that K.G. was mistaken about her recollection of the event; it would show that she mistakenly identified Sorum; and it would explain why her pants were down, why her vaginal area was wet, and why she experienced painful urination the next day. He further argues that case law has repeatedly recognized that testimony of the alleged victim's sexual activity may be introduced if it occurred around the same time as the criminal offense charged.

Defense counsel referenced sexual activity between K.G. and Postoak in his rape-shield motion and at the hearing, but he did so in the context of seeking to introduce the results of the DNA report. To the limited extent one could even say that defense counsel made an argument to admit such evidence, the trial court did not rule on the matter in that the written order referenced *only* the DNA evidence of unknown origin. *Rounsaville v. State*, 372 Ark. 252, 273 S.W.3d 486 (2008). The trial court, therefore, was never asked to assess the relevance of K.G.'s sexual activity and to engage in a balancing of prejudicial impact and probative value as required by the rape-shield statute. When the trial court was contemplating its ruling on the State's motion in limine precisely covering the subject of K.G.'s prior sexual contact with Postoak, defense counsel stated that he had no objection to excluding that evidence, even if he mistakenly believed that the matter had been decided by the trial court's earlier rape-shield ruling. Sorum's challenge was thus waived, and we do not address his arguments on appeal. *See Dillard, supra.*

In any event, defense counsel failed to proffer the evidence he sought to admit at the in camera hearing. Specifically, defense counsel referred to statements he asserts were made by Postoak and K.G., yet he did not provide those statements or any testimony. At an in camera hearing, the defendant must offer the evidence of prior sexual conduct. *Dicandia v. State*, 2010 Ark. 413. The failure to proffer evidence so that this court may determine prejudice precludes review of the issue on appeal. *Id. See also Marcum v. State*, 299 Ark. 30, 771 S.W.2d 250 (1989) (rejecting rape-shield argument where there was no proffer in the record of the evidence Marcum proposed to introduce); *Farrell v. State*, 269 Ark. 361, 601 S.W.2d 835 (1980) (refusing to reach the merits of rape-shield argument because the offer of proof of the victim's prior sexual conduct was inadequate).

Affirmed.

WHITEAKER and MURPHY, JJ., agree.

*Short Law Firm*, by: *Lee D. Short*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Ashley Priest*, Ass't Att'y Gen., for appellee.