# ARKANSAS COURT OF APPEALS

DIVISION I

No. CR-16-368

| | | |
|---|---|---|
| ERIK OMAR GARCIA | | **OPINION DELIVERED:** SEPTEMBER 20, 2017 |
| | APPELLANT | APPEAL FROM THE HEMPSTEAD COUNTY CIRCUIT COURT [NOS. 29CR-15-56 and 29CR-15-148] |
| V. | | |
| | | HONORABLE RANDY WRIGHT, JUDGE |
| STATE OF ARKANSAS | | |
| | APPELLEE | AFFIRMED |

## ROBERT J. GLADWIN, Judge

Erik Omar Garcia was convicted in the Hempstead County Circuit Court on four counts of rape and six counts of second-degree sexual assault. On appeal, Garcia challenges the sufficiency of the evidence to support his convictions and the trial court's denial of his motion to suppress his statement to police. We affirm.

Garcia was charged by felony information after his two younger cousins alleged that he had raped them.[1] On the day of his arrest, Garcia was Mirandized and questioned by Officer Jesus Coronado of the Hope Police Department. Garcia admitted to Coronado that he had used his penis to anally penetrate his eight-year-old cousin, MT. Prior to his trial on all the charges, Garcia filed a motion to suppress his statements to Coronado.

---

[1]Garcia was first charged on April 2, 2015, with two counts of raping one person under the age of fourteen. The information was amended to add the sexual-assault charges, and a further information was filed and subsequently amended under a second case number charging Garcia with the same crimes involving a second victim. These two cases were tried together.

At the suppression hearing, Garcia testified that he had been twenty-one years old when he was arrested. He described that, on the day of his arrest, he had been asleep and his mother woke him and told him there were several police cars outside their house. He dressed, answered the door, was asked by police to step outside, and was told that the police had a warrant for his arrest. He was handcuffed and placed in the patrol car, but he had to lie down because he did not fit into the small back seat. He was taken to the Hempstead County jail and booked. He said he was given a jumpsuit and that he felt uncomfortable when he had to change his clothes in front of a police officer. He was then handcuffed and taken to a bench to wait for Coronado. In two to three minutes, Coronado appeared, took the handcuffs off, and escorted Garcia to the interrogation room, which he described as having been cold and small. Coronado left and came back two or three minutes later. Garcia said he had been scared because it had been his first time in the interrogation room. Coronado returned, introduced himself, and said he had questions for Garcia. Garcia testified further as follows:

> [Coronado] said he had to read me my rights before he asked me any questions, but then he started asking me questions anyways. He asked me how to spell my name, what my birthday was, what my social security number was, and if I had ever been in any trouble. I said no, sir. He also asked if anybody had explained my rights and my charges. He asked who my parents were and where they worked, and how long we had been living in Hope. I was confused at this point, because I thought he was going to read me my rights and he started asking questions anyways. At that point, I thought I had to answer his questions anyways, because I didn't know if I had rights or not. He asked all these questions without providing me with any rights.
>
> I had never heard of the *Miranda* decision by February 26 of this year. The highest education degree I have is a high school diploma. I do recall Sergeant Coronado reading a document to me. I did not understand what he read to me. Like I said, I never heard them before because I hadn't been in trouble before. When he asked if I understood my rights, I nodded my head, but I didn't really understand my rights. I felt like since he was an officer with a lot of power that I had to answer

his questions, because I didn't know if I had rights. He slid the paper across the table and told me to initial next to my rights and sign. I did that very quickly without reading anything. I didn't read anything because I was scared and confused. He said he had to read me my rights before asking me questions, but he asked questions anyways. I thought I had to answer his questions.

The trial court filed an order on November 20, 2015, denying Garcia's motion to suppress and allowing the videotape and statement to be introduced at trial. At the jury trial, Coronado testified that he had investigated the case and had interviewed Garcia. The videotaped interview was admitted as evidence. As Garcia had described at the suppression hearing, a transcript of the interview reflects that Coronado first introduced himself and told Garcia that he wanted to get his side of the story. The interview continued as follows:

CORONADO:     There's one side and there's the other. Before I have to, or asked you any questions or anything I do have to read your rights but let me ask you something. Do you work anywhere or anything?

GARCIA:     Not right now.

CORONADO:     Not right now. Have you been employed?

GARCIA:     Yeah.

CORONADO:     Okay, where did you work at?

GARCIA:     I used to work at Ledwell.

CORONADO:     Ledwell.

GARCIA:     Texarkana.

CORONADO:     Okay, how long have you lived in Hope?

GARCIA:     Ah for, I was born here in Hope.

CORONADO:     Oh, was you? Okay. Cool. Whose your parents?

GARCIA:     Yolanda and Deotoro Garcia.

| CORONADO: | Where does your dad work? |
|---|---|
| GARCIA: | Tyson. |
| CORONADO: | Okay. You just look real familiar and I don't know if you look like your dad but you kind of favor somebody I know. |
| GARCIA: | I used to go to school here in Hope. |
| CORONADO: | Out here in Hope? Okay, what year did you graduate? |
| GARCIA: | 2012. |
| CORONADO: | 2012. |
| GARCIA: | I know your son. |
| CORONADO: | Okay, yeah, that's probably . . . all right . . . yeah, yeah, he just graduated last year so he was probably a, I guess a sophomore when you . . . |
| GARCIA: | Sophomore. |
| CORONADO: | Okay, yeah. I think today's the 26th, yes. You ever been in trouble before? |
| GARCIA: | No. |
| CORONADO: | No? Okay, did they explain your charges to you? |
| GARCIA: | Something like that. |

The transcript reflects that Coronado continued the interview and asked Garcia how to spell his name and to provide his date of birth and Social Security numbers. After those questions were answered, Coronado read Garcia his rights from a form, and Garcia initialed each line on the form to indicate that he understood his rights. As the interview progressed, Coronado explained that MT had made allegations of rape against Garcia. The following exchange occurred:

SLIP OPINION

| | |
|---|---|
| CORONADO: | . . . How old was he? He's saying eight or nine but I want to hear it from you. How old was he the first time that you actually had sex with him? |
| GARCIA: | About that time. |
| CORONADO: | About eight? |
| GARCIA: | Yeah. |
| CORONADO: | Okay, now this is real important, okay. |
| GARCIA: | I was younger before then. |
| CORONADO: | You were younger, okay. So, if he's ten now you were nineteen? |
| GARCIA: | Yeah, around eighteen/seventeen, around that. |

During the interview, Garcia denied having penetrated or ejaculated inside MT. Coronado then told Garcia that MT had been examined by a SANE nurse and that the results of that exam would reveal whether MT had been violated. The interview proceeded as follows:

| | |
|---|---|
| CORONADO: | But there's gonna show some little tears and stuff here and there, you know, that eventually may heal over time. You know it may take years, I don't know. But I just need you to be honest with me, man. I'm not gonna think no different cause I'm gonna tell whether you stuck it just a little bit in or all the way in, it's the same thing, okay. He said that you actually went in his, in his anus and that you, he felt something wet inside of his anus on one time that he can remember. Is that true? |
| GARCIA: | Yes. |
| CORONADO: | Okay, so you're saying you actually did penetrate his anus at least one time? |
| GARCIA: | Yeah. |

. . . .

5

SLIP OPINION

CORONADO: Okay. He had mentioned in that, let me stop you real quick. He had mentioned in there that you asked if you could lick his feet. Okay, I don't know if that's some kind of something that maybe turns you on, or turns him on and you're trying to get him to do that . . .

GARCIA: Right.

CORONADO: Is that true? Okay, so I guess you started to lick his feet?

GARCIA: Yeah.

. . . .

CORONADO: Okay, um, and you know of I guess [sic] rubbed yourself on his, on his anus at least five other times?

GARCIA: Yes.

CORONADO: . . . And the last time it's happened, it happened uh, sometime right before Thanksgiving maybe? Does that sound right?

GARCIA: Yeah.

Coronado further testified that he had interviewed Garcia a second time the day after the first interview. Coronado asked Garcia if there had been anyone else that he had victimized, and Garcia answered no. However, Coronado testified that, during his investigation, he had interviewed JT, MT's younger brother, and following that interview, "we felt there was sufficient evidence to pursue additional charges against" Garcia.

On cross-examination, Coronado denied having asked Garcia incriminating questions during the interview before he had given Garcia his *Miranda* warning. He claimed that he had been trying to make Garcia comfortable by creating a rapport with him before Mirandizing him.

Willis Smith, a licensed associate counselor for Southwest Arkansas Counseling and Mental Health Center at the Hope Outpatient Clinic, testified that he had made the report to the Arkansas Child Abuse Hotline on February 18, 2015, because MT, a ten-year-old client, said that he had been raped by his cousin, Garcia. MT specifically said that his cousin put his "middle spot" on him. He also reported that his cousin had licked his feet. MT nodded "yes" when asked if Garcia's middle part was placed into MT's rear end. Smith said that MT was referred to him for anxiety issues on February 5, 2015, and he had made the disclosure about Garcia on February 18, 2015. Smith described that MT had excessive anxiety separation, was reluctant to go to school, and had complained of stomachaches and headaches. MT had shown social isolation and regression in maturity. After developing some coping skills in therapy, MT disclosed that Garcia had abused him. Smith said that when MT would tell him about the specific moment of penetration, he would have to stop and use the adaptive coping skills, and MT had identified that part of the story as the worst part. Smith said that MT had started school in the fall but began a regression when he learned about Garcia's court date. MT was placed in Riverview, an inpatient psychiatric hospital in Texarkana that helps people who are at risk of hurting themselves.

On cross-examination, Smith stated that he specifically had asked MT if his offender's middle spot was "in" him, and MT had replied, "Yeah." Smith testified that he did not know if—when a child says he put his middle part in me—in the child's mind, that could include a penis rubbing between the child's buttocks. Smith also said that he had been a licensed counselor for about a month when MT revealed the story to him on February 18,

2015, but that he had experience before that as an associate counselor. He also admitted that the words "penetration" and "sodomy" were not in his report.

MT testified that he was eleven years old and in the fifth grade. He said that when he had gone to school in Hope, he and his brother, JT, went to Garcia's house after school because their mother had been at work. He said Garcia's mom had taken care of them. He said that Garcia would take him and JT to his room, and do "stuff to us." MT said that Garcia put his "middle spot" in "my anus." He said that he had learned the word "anus" from Smith, who was teaching him proper words for body parts so that they could be used in court. MT repeated that when Garcia's mother went to the store or was not there, Garcia would take him, and sometimes him and JT, to his room and "[Garcia] put his penis inside my anus." He described Garcia's state of undress and the positions in which Garcia would place them. MT also described that he had felt something wet on his anus and that Garcia would use a t-shirt to wipe it off. MT said that sometimes there would be penetration, other times Garcia would rub his penis beside his anus, and other times Garcia made MT rub Garcia's penis with his hand. MT also said that Garcia had licked his feet. MT said that he had seen Garcia do "things" to JT and that Garcia had stuck "his penis inside [JT's] anus." He said that before Smith had taught him about body parts, he called a penis the "middle spot" and an anus a "behind."

After MT and JT's mother testified, Willis Smith testified about counseling JT. He said that JT's mother told him that JT had disclosed that Garcia had been licking JT's feet. Smith said that he then called the child–abuse hotline, and JT became Smith's client. In the

initial counseling session, JT disclosed the licking of his feet, and in a later session, he disclosed the rape.

JT testified that he is ten years old and is Garcia's cousin. He described staying at Garcia's house after school when his mother had worked. He said that when Garcia's mother was not home, Garcia had done "bad" things to him. Garcia had taken him to his room and put his penis in JT's anus. JT described the positions Garcia placed him in and the act of penetration. He said that he knew Garcia's penis was "going inside my anus" because he saw it. JT said that this had happened more than once, more than twice, and more than three times. He also said that sometimes Garcia had licked his feet.

Garcia moved for a directed verdict, renewing his request to have the two interviews with Coronado suppressed. He claimed that without that evidence, there was not sufficient credible evidence of rape. He claimed that the children's "methodic" use of the words "anus" and "penis" negated their credibility. He also argued that there was not sufficient proof that the children were under the age of fourteen at the time of the events. He claimed that proof of their birth dates was a prerequisite under the statute. He also argued that the State had not provided evidence that he was over eighteen years old.

The trial court noted that it had previously ruled on the suppression motion and that there had been enough evidence presented to meet the State's burden of proof. Accordingly, the trial court denied the directed-verdict motion.

In Garcia's case-in-chief, David Hampton testified that he is an investigator for crimes against children with the Arkansas State Police. He said that in his report on JT, the abuse was unfounded and unsubstantiated. He said on cross-examination that "unsubstantiated"

9

did not mean that something did not happen. He also said that, many times, a child will not disclose abuse at an interview despite having been sexually abused.

Melanie Halbrook, a forensic interviewer for the Texarkana Children's Advocacy Center, said that in her interview with MT, he had claimed that Garcia had placed his penis in MT's anal area. MT at first said that his underwear was still on when this had happened, but he later clarified that his underwear had been pulled down. On cross-examination, she said that MT had indicated that Garcia's middle spot had actually gone into his behind. Willis Smith testified that he had not reviewed JT's medical records.

Garcia testified, as he had at the suppression hearing, regarding the facts and circumstances surrounding his arrest. After watching a portion of the interview on videotape, Garcia stated that he had been scared and confused. He said that he had been confused by the "part where he said he was going to read my rights. Instead of reading my rights he kept asking questions, so I thought I probably didn't have any rights. I felt like I had to talk to him, regardless." He also said that he had been confused by Coronado's statement to him that he knew there would be tissue tearing. Garcia testified, "I thought, if he thinks I did it then why lie? I just told him what he wanted to hear." He said that it was not a true statement when he told Coronado that there had been penetration. Garcia admitted having rubbed his penis between MT's buttocks on five occasions, but he denied having licked MT's feet. He denied having done anything sexually inappropriate or illegal with JT, and he said that he had never licked any child's feet.

On cross-examination, Garcia said that the videotape showed that he had been nervous during the interview and that his leg had been shaking. On redirect examination, Garcia said that it had been a combination of things that had scared him.

Garcia moved for a directed verdict at the close of all evidence, arguing that the age requirements of the alleged perpetrator and victims had not been established for purposes of the rape or the second-degree sexual assault, and he incorporated his earlier arguments. The trial court denied the motion.

After closing arguments had been presented to the jury, it found Garcia guilty on all the rape and second-degree sexual-assault charges. After a sentencing hearing, the jury recommended that Garcia be sentenced to forty years each for two rape counts; twenty-five years each for two rape counts; twenty years on each of the five second-degree sexual-assault charges; and five years for the one second-degree sexual-assault charge. The trial court sentenced him to forty years on count 1, rape, and twenty-five years on count 8, rape, to be served consecutively. All other sentences were to run concurrently.

## I. *Sufficiency of the Evidence*

A person commits rape if he or she engages in sexual intercourse or deviate sexual activity with another person who is incapable of consent because he or she is mentally incapacitated. Ark. Code Ann. § 5-14-103(a)(2)(C) (Supp. 2015). "Deviate sexual activity" means any act of sexual gratification involving the penetration, however slight, of the labia majora or anus of a person by any body member or foreign instrument manipulated by another person. Ark. Code Ann. § 5-14-101(1)(B) [(Repl. 2013)].

*Sorum v. State*, 2017 Ark. App. 384, at 8, ___ S.W.3d ___, ___. A person commits sexual assault in the second degree if that person, being eighteen years of age or older, engages in

sexual contact with another person who is less than fourteen years of age. Ark. Code Ann.
§ 5-14-125(a)(3)(A) (Repl. 2013).

Garcia argues that the State's evidence was not sufficient to sustain his convictions;
thus, he contends that the trial court erred in failing to grant his motion for directed verdict.
He argues that MT and JT gave methodical testimony in their use of the words "penis" and
"anus"; that both boys stated they had been taught by "Mr. Will" to use the specific words
they used; that no proof was given of MT's, JT's, or Garcia's birth date or age, other than
their testimony or statements; and that age is a required element of both rape and second-
degree sexual assault.

> We treat the denial of a motion for directed verdict as a challenge to the
> sufficiency of the evidence. *King v. State*, 323 Ark. 671, 916 S.W.2d 732 (1996). The
> test for determining the sufficiency of the evidence is whether there is substantial
> evidence to support the verdict. *Id.* Evidence is substantial if, when viewed in the
> light most favorable to the State, it is of sufficient force and character to compel
> reasonable minds to reach a conclusion and pass beyond suspicion and conjecture.
> *Id.* Matters such as evaluating a witness's credibility and resolving inconsistencies in
> the evidence are issues for the jury and not the court. *Phillips v. State*, 344 Ark. 453,
> 40 S.W.3d 778 (2001). On appellate review, it is permissible to consider only that
> evidence that supports the guilty verdict. *Arnett v. State*, 353 Ark. 165, 122 S.W.3d
> 484 (2003).
>
> A rape victim's testimony may constitute substantial evidence to sustain a
> conviction of rape, even when the victim is a child. *Gatlin v. State*, 320 Ark. 120,
> 895 S.W.2d 526 (1995). The rape victim's testimony need not be corroborated, nor
> is scientific evidence required, and the victim's testimony describing penetration is
> enough for a conviction. *Id.* The principle that a victim's uncorroborated testimony
> constitutes substantial evidence to support a guilty verdict is likewise true with respect
> to sexual offenses other than rape. *See, e.g., Arnett*, 353 Ark. 165, 122 S.W.3d 484
> (incest); *Laughlin v. State*, 316 Ark. 489, 872 S.W.2d 848 (1994) (sexual solicitation).

*Brown v. State*, 374 Ark. 341, 342–43, 288 S.W.3d 226, 228–29 (2008).

We hold that sufficient evidence supports the convictions. The State summarizes the
evidence as set forth above. The victims' testimony, among other evidence, including

Garcia's admission to the sexual assault and rape of MT, constitutes sufficient evidence to support the convictions. The credibility of the victims was for the jury to determine and not for this court on appeal. *E.g.*, *Moore v. State*, 372 Ark. 579, 279 S.W.3d 69 (2008). The victims, moreover, both described the sexual acts using their own body-parts terminology, such as "middle spot" and "private part," and then explained to which body parts they were referring in terms of "penis" and "anus." MT described Garcia's penis as "going in and out" of his anus and demonstrated that act to Melanie Halbrook using anatomically correct dolls. The victims clearly understood the acts they described during their testimony. That they used terms that were taught to them as part of their counseling treatment did not render their testimony unbelievable, despite Garcia's argument to the contrary.

Further, in his statement to Officer Coronado that was played for the jury, Garcia stated his date of birth, which made him over eighteen years of age over the period of time during which the offenses occurred from about May 27, 2012, through November 30, 2014. Based on their testimony as to their ages at the time of the trial, both victims clearly would have been under fourteen years of age at the time of the offenses.

## II. *Motion to Suppress*

Garcia contends that the trial court erred in denying his motion to suppress his statements. The Arkansas Supreme Court recently set forth our controlling law as follows:

> Upon review of a trial court's denial of a motion to suppress, we make an independent determination based on the totality of the circumstances; we view the evidence in the light most favorable to the appellee, and we reverse the trial court's ruling only if it is clearly erroneous or against the preponderance of the evidence. *Whalen v. State*, 2016 Ark. 343, at 4–5, 500 S.W.3d 710, 713.

*Coleman v. State*, 2017 Ark. 218, at 3–4, 521 S.W.3d 483, 486. Further, when reviewing

the admissibility of statements made while in police custody, the following law is applicable:

> A statement made while in custody is presumptively involuntary, and the burden is on the State to prove by a preponderance of the evidence that a custodial statement was given voluntarily and was knowingly and intelligently made. *Flowers v. State*, 362 Ark. 193, 208 S.W.3d 113 (2005). In order to determine whether a waiver of *Miranda* rights is voluntary, this court looks to see if the confession was the product of free and deliberate choice rather than intimidation, coercion, or deception. *Id*. In order to make this determination, this court reviews the totality of the circumstances surrounding the waiver including the age, education, and intelligence of the accused; the lack of advice as to his constitutional rights; the length of the detention; the repeated and prolonged nature of the questioning; the use of mental or physical punishment; and statements made by the interrogating officers and the vulnerability of the defendant. *Id*. The fact that the defendant is not a stranger to the criminal-justice system is a factor to be considered in determining whether a custodial statement was voluntarily made. *Sweet v. State*, 2011 Ark. 20, 370 S.W.3d 510. This court will reverse a circuit court's ruling on this issue only if it is clearly against the preponderance of the evidence. *Id*.

> The evaluation of the credibility of witnesses who testify at a suppression hearing about the circumstances surrounding an appellant's custodial confession is for the trial judge to determine, and this court defers to the position of the trial judge in matters of credibility. *Shields v. State*, 357 Ark. 283, 166 S.W.3d 28 (2004). Conflicts in the testimony are for the trial judge to resolve, and the judge is not required to believe the testimony of any witness, especially that of the accused, since he or she is the person most interested in the outcome of the proceedings. *Winston v. State*, 355 Ark. 11, 131 S.W.3d 333 (2003). So long as there is no evidence of coercion, a statement made voluntarily may be admissible against the accused. *Howell v. State*, 350 Ark. 552, 89 S.W.3d 343 (2002).

*Leach v. State*, 2012 Ark. 179, at 11–12, 402 S.W.3d 517, 525–26.

First, Garcia reiterates that Coronado stated that he would "have to read your rights

but let me ask you something." Coronado then asked Garcia sixteen questions before

Mirandizing him. Garcia argues that he was twenty-one years old, lived with his parents,

had been arrested but had not been told what he was charged with, and Coronado told him

that he would have his rights read to him, but that was not done immediately. He claims

that because he was asked questions before being Mirandized, he thought he had to answer all the questions.

Garcia sites *Missouri v. Siebert*, 542 U.S. 600 (2004), in which the United States Supreme Court held that *Miranda* warnings given midinterrogation after a defendant had given a confession were ineffective; thus, the confession repeated after the warnings was inadmissible at trial. *Siebert* found that questioning prior to a *Miranda* waiver is problematic and "likely to mislead and 'deprive' a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them." *Id*. at 601. Garcia argues that Coronado set forth the rule that before Garcia was to be questioned, he would be read his rights. Coronado then broke the rule by asking several questions.

The State argues that the trial court did not err in denying Garcia's motion to suppress. We agree. The State points to the testimony of both Garcia and Coronado and to the videotape of Garcia's interview. The State emphasized that Garcia indicated that he understood his rights and initialed each line of the *Miranda*-rights forms. Following his indication that he understood his rights, Garcia admitted that he had licked MT's feet, rubbed his penis on MT's anus, and penetrated MT's anus with his penis on one occasion. Even though Garcia claimed that he had been confused when he made his admissions, this court defers to the superior position of the trial court to determine the credibility of witnesses. *Leach*, *supra*. Further, S*iebert* is distinguishable, because no confession was obtained here by questioning Garcia before he was Mirandized. The preliminary questions Coronado asked were not an attempt to elicit a confession. Based on the totality of circumstances, we hold that no clear error occurred.

Second, Garcia contends that after the waiver had been signed, Coronado "employed subterfuge and outright lies as to what a forensic exam would show" to obtain a confession. Garcia argues that Coronado told him what a well-qualified officer he was and then "lied" about what the forensic evidence would show to coerce a confession. Garcia claims that his case should be reversed and remanded due to this error. This argument is not preserved for appellate review. The record reflects that Garcia's argument in the circuit court was confined to the issue of the voluntariness of his waiver of rights in light of Coronado's questioning before the *Miranda* rights were given. Garcia did not argue that Coronado's statements after the *Miranda* rights had been given were a form of coercion. Because the trial court did not rule on this particular argument, we do not address it. *Ilo v. State*, 350 Ark. 138, 85 S.W.3d 542 (2002).

Affirmed.

HARRISON and KLAPPENBACH, JJ., agree.

*Camille Edmison*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Rachel Kemp*, Ass't Att'y Gen., for appellee.